**UNITED STATES of America**

v.

**John E. JONES, Appellant.**

**No. 74–1830.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 21, 1975.

Decided Dec. 15, 1975.

Katherine H. Hayes,* with whom Sherman L. Cohn, Washington, D. C. (appointed by this Court), William W. Greenhalgh, Washington, D. C., and Gordon A. Rehnborg, Jr.,* were on the brief for appellant.

Robert E. Hauberg, Jr., Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and S. Allen Early, III, Asst. U. S. Attys., were on the brief for appellee.

Before TAMM and MacKINNON, Circuit Judges, and JAMESON,** Senior United States District Judge for the District of Montana.

TAMM, Circuit Judge:

Appellant John E. Jones was convicted on three counts of violating the Federal

---

* Entered appearances as student counsel pursuant to Rule 20 of the General Rules of this Court.

** Sitting by designation pursuant to 28 U.S.C. § 294(d).

Narcotics Laws, 21 U.S.C. § 174, *repealed*, Pub.L. 91–513, 84 Stat. 1291 (October 27, 1970); 26 U.S.C. §§ 4704(a), 4705(a), *repealed* Pub.L. 91–513, 84 Stat. 1292 (October 27, 1970).[1] Appellant sold narcotics to an undercover narcotics agent on October 21, 1970, but he was not arrested until December 15, 1971, after agents were able to identify him from a photograph fortuitously discovered during an unrelated search. Appellant's first trial, commenced on February 5, 1973, ended in a mistrial on February 8, 1973, when the jury was unable to reach a verdict. On June 10, 1974, a second jury trial was convened and appellant was convicted on all three counts. On July 26, 1974, District Judge Aubrey E. Robinson, Jr. sentenced Jones to a term of five years' imprisonment for each of the three counts, the sentences to be served concurrently.

On appeal, appellant first contends that the delay of over 13 months between the date of the narcotics sale and the date of his arrest was unnecessary and prejudicial in that it rendered him unable to present his defense and significantly increased the likelihood of misidentification. In support of this contention, appellant invokes a line of narcotics cases in this circuit beginning with *Ross v. United States*, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965). Generally speaking, the *Ross* line establishes the rule that, under certain circumstances, an unreasonable delay preceding arrest may so prejudice the interests of an accused as to raise due process difficulties and require dismissal of charges pursuant to this court's supervisory power over criminal cases arising in this circuit. Secondly, appellant contends that the delay of some 13 months between the date of the arrest and the beginning of the trial violated his sixth amendment right to a speedy trial. For the reasons stated below, we reject both claims and affirm appellant's conviction.

1. The subsequent repeal of these sections does not affect appellant's conviction. The relevant savings provision is section 1103 of Pub.L. 91–513, 84 Stat. 1294 (October 27, 1970).

## I. Statement of Relevant Facts

There was some disagreement concerning the facts at trial. The jury rationally could have concluded, however, that the following events transpired. At approximately one o'clock in the afternoon of October 21, 1970, Albert I. Logan, a Special Agent with the Bureau of Narcotics and Dangerous Drugs ("BNDD"),[2] working undercover for a single narcotics transaction, met with Edward A. Fleming, an informant, in an attempt to gather information leading to the arrest of narcotics offenders. Special Agents Jackson and Marshall were assigned to observe the activities of Agent Logan and informer Fleming (Tr. II 40–45, 61, 73).

Following a brief conversation with Albert I. Nicks, a suspected narcotics dealer, Logan and Fleming drove to a Burger Chef restaurant located in northwest Washington while Nicks, carefully followed by Agents Jackson and Marshall, drove to the Golden Cue Pool Room, also in Washington (Tr. II 46, 97, 135–36).

After engaging in a brief conversation in front of the pool room with a man later identified as the appellant, Nicks returned to the restaurant where Logan and Fleming were waiting. There Fleming got into Nick's automobile and the two men drove to 9th and M Streets, Northwest Washington (Tr. II 47, 98–100, 135–36).

At the corner of 9th and M Streets, Nicks and Fleming conversed with appellant, who had emerged from a gray, 1964 Pontiac LeMans convertible. Appellant then returned to the convertible and proceeded to the vicinity of the Golden Cue, followed by Nicks and Fleming, where he left his car and walked to a nearby Buick Riviera. After retrieving something from the Riviera, appellant entered the automobile driven by Nicks and returned with the other two men to

2. The BNDD was abolished in 1973 and the Drug Enforcement Administration was established.

the Burger Chef at approximately 3:30 in the afternoon (Tr. II 47, 100–02, 136).

Back at the Burger Chef, Fleming emerged from the car and met Logan. The two men got into the car with Nicks and appellant. Logan noticed that Nicks was driving and that appellant was in the rear seat directly behind Nicks. Logan got into the right rear seat, and Fleming sat in front.

Once inside, Nicks, following appellant's instructions, handed Logan a small glassine bag containing a white powder.[3] Logan asked the price, and Nicks replied, "$300." Fleming passed the bag to Logan, who in turn handed Fleming $300 in cash (Tr. II 50–52). Appellant, saying that he wanted to see what he was getting, then grabbed the money and demanded that Logan exchange one of the bills, which Logan did. Appellant then passed the money to Nicks, who put it in his pocket. Climbing out of the car with Logan and Fleming, appellant told them that they should contact Nicks for future transactions and that Nicks in turn would contact him. Appellant then returned to the car and drove off with Nicks (Tr. II 54).

The entire transaction took somewhere between five and fifteen minutes. During this time, Agent Logan sat approximately two feet away from appellant. At no time during the transaction did appellant state his name or otherwise identify himself.[4] When he returned to the BNDD office on October 21, 1970, Logan described appellant as a black male, thirty to thirty-five years old, 5'7" tall, weighing 140 to 150 pounds, with a mustache and a dark brown complexion (Tr. II 85). At the time of the transac-

tion, appellant was wearing a brown corduroy jacket, plaid slacks, and a Russian-type cap (Tr. II 69). Agents Jackson and Marshall generally corroborated Logan's testimony respecting this description.

Following the transaction, Agent Logan made several unsuccessful attempts to identify and locate appellant. On the day of the transaction, informant Fleming told Logan that he did not know appellant's name (Tr. II 70–80). Logan later returned to Nicks in November, 1970, but Nicks refused to do business with Logan because he thought that Fleming was "wrong," i. e. was supplying information to the police (Tr. II 79–80, 87, 90). Logan asked Nicks several times for the name of the man in the back seat, but Nicks refused to tell him (Tr. II 253–55). Logan also returned to the 7th and T Streets area between three and five times from December, 1970, to February, 1971, in an attempt to locate appellant (Tr. II 79–80). At no time did Logan attempt to identify appellant through BNDD or Metropolitan Police photographic files.[5]

Agent Jackson also made some effort to locate appellant through questioning seven or eight informants and directing other agents to attempt to locate him. In addition, Jackson went to the Golden Cue for three or four nights after the transaction[6] and unsuccessfully attempted to locate appellant through tracing the Pontiac LeMans and the Buick Riviera. Unable to locate either car, Jackson directed other agents to attempt to locate the owners.

At this point, the Government contends, all investigative leads had come to

---

3. There was no written order for the package, which bore no tax stamps (Tr. II 55). A Government chemist subsequently identified the white powder as heroin, with a strength of 54.6 percent (Tr. II 161). No latent fingerprints of value were developed from the glassine bag (Tr. II 169).

4. Agent Logan testified that he had never met appellant prior to October 21, 1970.

5. BNDD files contained approximately 5,000 photographs of persons previously arrested on narcotics charges. Metropolitan Police files contained approximately 55,000 photographs. Both files required a name in order to locate a particular photograph (Tr. II 88–89, 92).

6. Agent Jackson testified that, as a non-undercover man, he did not ask for appellant by name because he wanted to avoid causing appellant to flee (Tr. II 119, 126).

an end. Without a name there was no way to search the voluminous police files. Fleming had said that he did not know appellant, and Nicks would not cooperate. Then, on November 24, 1971, over 13 months after the narcotics transaction in question, Logan, while engaged in an unrelated search of a suspected narcotics dealer's apartment, fortuitously discovered a photograph of a man resembling appellant. The photograph, which Logan picked from among a group of approximately 350 photographs, depicted appellant wearing a brown corduroy jacket and a Russian-type cap.

One week later, the then-defendant in the search warrant case informed Agent Logan that the man in the picture was "Bay Boy Jones." Logan then verified this identification and obtained appellant's true name through BNDD and police files. On December 15, 1971, the day after the arrest warrant issued, Logan participated in the arrest of appellant at his home in Washington in order to confirm the identification (I Tr. I 15, 49; Tr. II 58–60). At the trial, Agents Logan and Jackson identified Jones as the "unknown individual" who had participated in the narcotics transaction of October 21, 1970 (Tr. II 51, 93, 98, 100–05, 112, 115). The first trial ended in a mistrial, the second in a conviction, and

on July 29, 1974, appellant filed notice of this appeal. Jurisdiction is properly invoked under 28 U.S.C. § 1291 (1970).

## II. Pre-Arrest Delay

### A. The Legal Framework: Ross and Its Progeny

■ Appellant contends that the charges against him should be dismissed because the delay of more than 13 months between the date of the narcotics sale and the date of his arrest was unreasonable, prejudiced his ability to put on a defense and increased the likelihood of misidentification.[7] Appellant relies on a line of cases in this circuit beginning with Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965). Generally speaking, the Ross line of cases establishes the proposition that any unreasonable or unnecessary pre-arrest delay which results in prejudice to the accused may necessitate dismissal of the charges against him.[8] See, e. g., Robinson v. United States, 148 U.S.App.D.C. 58, 459 F.2d 847 (1972); Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214 (1966).[9] We noted in these cases that the increased use of undercover police methods had necessitated a reconciliation between the competing interests of effective enforcement of the narcotics laws[10] and early notice to the accused-

---

7. Appellant does not contend that the pre-arrest delay violated his sixth amendment right to a speedy trial, since that issue was resolved against him in United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). See also Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The Supreme Court noted in Marion, however, that in the proper case a pre-arrest delay could result in a violation of the due process clause. 404 U.S. at 324, 92 S.Ct. 455. It thus appears established that the sixth amendment right to a speedy trial attaches at the time of arrest or of formal charges, whichever comes first.

8. In Ross v. United States, the foundation case in this line, a narcotics conviction was reversed where the record demonstrated (1) a purposeful delay of seven months between the date of the offense and the arrest, (2) a plausible claim that the defendant was unable to recall or reconstruct the events of the day of the offense, and (3) a trial in which the case against the appellant consisted solely of the

recollection of one eye witness (the undercover agent) refreshed by a notebook. 349 F.2d at 215.

9. Earlier cases in this circuit had indicated that the statute of limitations is not the sole standard by which delay between offense and complaint is to be measured, that a delay between offense and prosecution might be so oppressive as to constitute a denial of due process. See Nickens v. United States, 116 U.S.App.D.C. 338, 340 n. 2, 323 F.2d 808, 810 n. 2 (1963); Wilson v. United States, 118 U.S. App.D.C. 319, 321–323, 335 F.2d 982, 984–86 (1964) (Bazelon, C. J., dissenting).

10. Although the Ross line deals specifically with enforcement of the narcotics laws, the Ross analysis has been extended to other situations in which the nature of the Government's proof is such that it can be easily "blurred, obscured, dissipated or destroyed by the passage of time." Tynan v. United States, 126 U.S.App.D.C. 206, 208, 376 F.2d 761, 763,

to-be of the impending accusation. *Robinson v. United States, supra* 148 U.S. App.D.C. at 61, 459 F.2d. at 850. *See, e. g., Godfrey v. United States,* 123 U.S. App.D.C. 219, 221, 358 F.2d 850, 851 (1966); *Powell v. United States,* 122 U.S. App.D.C. 229, 232, 352 F.2d 705, 708 (1965). A general pattern emerges from these cases: in each case,[11] the police knew the whereabouts of the accused-to-be but postponed arresting him, despite his availability, in order to protect an informer or avoid revealing the identity of an undercover agent who had not yet "surfaced." Mindful of the fact that such undercover investigations often continue for many months while alleged violators remain unaware that they will be charged, the *Ross* court cautioned that:

> [i]t is always to be remembered that the [delay] is a conscious act on the part of the police. That alone does not condemn it, because the Department is motivated solely by a purpose to enhance its effectiveness in the public interest. But the Constitution contemplates a separate interest in fair procedures for the citizen faced with the loss of his liberty by reason of criminal charges. When interests of this nature impinge on each other, as they have a way of doing, they must be accommodated. A balance must be struck, if one or the other is not to be sacrificed completely.

*Ross v. United States,* 121 U.S.App.D.C. at 236, 349 F.2d at 213, *quoted in Robinson v. United States,* 148 U.S.App.D.C. at 62, 459 F.2d at 851.

On the basis of our supervisory power over criminal trials in this circuit, but mindful of the due process overtones of the problem, we thus held that narcotics charges must be dismissed where the delay between the undercover agent's detection of the crime and notice to the accused of criminal charges is unreasonable and prejudicial to him. *Robinson v. United States,* 148 U.S.App.D.C. at 62, 459 F.2d at 851, *citing Ross v. United States,* 121 U.S.App.D.C. at 236, 349 F.2d at 213. The *Ross* rule assumes that the accused is available for arrest and would be arrested were it not for the need to protect an informer or to keep an undercover agent underground; its purpose is to limit the extent to which the police may consciously trade off the interests of the accused-to-be in receiving early notice of the accusations against him in favor of the societal interest in discovering and apprehending narcotics offenders. The fundamental concern underlying the rule is that the delay necessitated by this choice of police methods significantly increases "the risk of conviction of an innocent person." *Daniels v. United States,* 123 U.S.App. D.C. 127, 130, 357 F.2d 587, 590 (1966) (dissenting opinion) (*rehearing denied* 1966) (footnote omitted). *See also Woody v. United States,* 125 U.S.App. D.C. at 194, 370 F.2d at 216 (1966). Some delay is, of course, inevitable, and therefore legally permissible, due to the requirements of effective police work. Courts, nevertheless, must consider the adverse impact on the accused. Accordingly, a two-pronged test has evolved under which the court must examine the reasonableness of the delay and the resulting harm, if any, to the accused. *Robinson v. United States,* 148 U.S.App. D.C. at 63, 459 F.2d at 852. *See, e. g., Lee v. United States,* 125 U.S.App.D.C. 126, 127 n. 2, 368 F.2d 834, 835 n. 2 (1966).

Although it is indeed dangerous to overgeneralize concerning these cases, a "rough rule of thumb" has emerged that delays of less than four months require no detailed exploration of underlying reasons.[12] As a corollary, we have

---

*cert. denied,* 389 U.S. 845, 88 S.Ct. 95, 19 L.Ed.2d 111 (1967). *See, e. g., United States v. Parish,* 152 U.S.App.D.C. 72, 468 F.2d 1129 (1972), *cert. denied,* 410 U.S. 957, 93 S.Ct. 1430, 35 L.Ed.2d 690 (1975) (armed robbery and assault).

11. An exception, *Godfrey v. United States,* 123 U.S.App.D.C. 219, 358 F.2d 850 (1966), will be discussed *infra.*

12. For a summary of delay duration in various cases, *see Robinson v. United States,* 148 U.S. App.D.C. at 63 n. 28, 459 F.2d at 852 n. 28.

held that where an agent surfaces *within* the four-month period, the government is required "to make a diligent effort to find and notify the accused promptly thereafter." *Robinson v. United States*, 459 F.2d at 852, *citing United States v. Mills*, 149 U.S.App.D.C. 345, 353–355, 463 F.2d 291, 299–301, *rehearing denied* (1972); *Godfrey v. United States*, 123 U.S.App.D.C. at 220–21, 358 F.2d at 851–52.

■ It is possible in the *Ross*-type cases to distinguish two general types of prejudice, sometimes called "special circumstances," which may be attributable to pre-arrest delays. The first, which the court initially confronted in *Ross*, is damage to the accused's ability to present a defense because of, *inter alia*, his own or his witnesses' lack of memory concerning his actions,[13] his inability to establish an alibi,[14] or unavailability of witnesses who, but for the delay, otherwise might have been able to contradict the Government's case.[15]

■ A second, similar category of prejudice relates more directly to the nature of the Government's case and the reliability of the evidence used to identify the accused. We have noted the "lurking danger of misidentification" inherent in narcotics cases where the only evidence against the accused consists of the uncorroborated testimony of an undercover agent who had but a single brief encounter with the accused. *Robinson v. United States*, 148 U.S.App.D.C. at 64, 459 F.2d at 853. *See, e. g., Hardy v. United States*, 127 U.S.App.D.C. 162, 165–71, 381 F.2d 941, 944–50 (1967); *Woody v. United States*, 125 U.S.App.D.C. at 192, 370 F.2d at 214; *Ross v. United States*, 121 U.S.App.D.C. at 238, 349 F.2d at 215. Factors to be considered in assessing the danger of mis-

identification include (1) whether the undercover agent knew the seller before the transaction, (2) how long before the arrest the transaction took place, (3) whether the agent took adequate notes, (4) when and how the seller was identified after the sale, (5) whether the agent's testimony is corroborated, and (6) whether the agent and seller engaged in multiple contacts or in but a single transaction. *Cf. Robinson v. United States*, 148 U.S.App.D.C. at 64, 459 F.2d at 853. The exact weight to be assigned to each of these factors will vary, of course, according to the facts of each particular case.

## B. The Ross *Analysis Applied*

### 1. The Requirement of Purposefulness.

Turning now to the facts before us, we confront the initial question: whether this case fits within the *Ross* line at all. The Government argues with some force that this case is distinguishable from the *Ross*-type cases because the delay was not purposeful and because Jones was not continuously available for arrest; he merely successfully evaded all efforts to apprehend him. The Government further contends that, because Agent Logan was undercover for only a single transaction, there was absolutely nothing to gain from further delay and, therefore, the agents attempted diligently, if unsuccessfully, to identify and locate appellant. When, finally, their luck changed and Agent Logan stumbled across a photograph of appellant during the course of an entirely unrelated search, the Government contends that Agent Logan acted with reasonable promptness to identify appellant and bring about his arrest.

---

13. *See, e. g., Robinson v. United States*, 148 U.S.App.D.C. 58,.63, 459 F.2d 847, 852 (1972); *Dancy v. United States*, 129 U.S.App.D.C. 413, 416, 395 F.2d 636, 639 (1968); *Woody v. United States*, 125 U.S.App.D.C. at 194, 370 F.2d at 216; *Powell v. United States*, 122 U.S.App.D.C. 229, 231, 352 F.2d 705, 707 (1965); *Jackson v. United States*, 122 U.S.App.D.C. 124,

126, 351 F.2d 821, 823 (1965); *Ross v. United States*, 121 U.S.App.D.C. 233, 349 F.2d 210, 213 (1965).

14. *Robinson v. United States*, 148 U.S.App.D.C. at 65, 459 F.2d at 854.

15. *Id.; Woody v. United States*, 125 U.S.App.D.C. at 194, 370 F.2d at 216.

Appellant argues in response that the delay was in fact purposeful because the agents unjustifiably allowed appellant to drive away following the illegal transaction when there was surely probable cause and sufficient manpower to arrest him. Appellant relies on *Godfrey v. United States, supra,* for his contention that the delay was rendered unreasonable or unnecessary because the agents failed to act with the requisite degree of diligence to locate and arrest appellant thereafter.

■ The facts before us to some extent differentiate this case from more typical *Ross* situations. It does appear that the agents initially acted purposefully in not arresting appellant at the time of the illegal sale, whatever their reasons.[16] Nevertheless, there is no indication whatsoever that the great bulk of the delay was purposeful or that the Government secured or attempted to secure any tactical advantage in delaying appellant's arrest. Indeed, the facts show that Agents Logan and Jackson made a number of genuine, if unsuccessful, attempts to identify and locate appellant. In short, the bulk of the substantial delay in appellant's arrest is attributable not to any conscious decision to postpone his arrest, but to the inability of the agents to identify or locate him.[17] Because of the initial decision not to make an arrest at the time of the illegal sale, and because of the undercover police methods used, however, we conclude that the facts before us must be analyzed against the background of the *Ross* line of cases. We turn now to the question of whether the delay was reasonable and necessary.

### 2. The Reasonableness of the Delay

■ The primary case on point, reflecting a factual situation in some respects similar to our own, is *Godfrey v. United States, supra.* Where an undercover agent surfaces, as Agent Logan did, during the four-month period immediately following the illegal transaction, *Godfrey* holds that it is incumbent upon the police to act diligently to arrest the accused as soon as possible thereafter. 123 U.S.App.D.C. at 221, 358 F.2d at 852. We conclude that the efforts of Agents Logan and Jackson to identify and arrest appellant satisfied this requirement.

In *Godfrey,* narcotics officers had identified the accused, obtained an arrest warrant, and set out to execute it. When the officers failed to locate the accused at the address where they believed he was staying, they merely advised federal and local agents that the accused was wanted, lodged his name in various warrant books, and briefly surveilled certain areas where they thought he was likely to be found. Two months later, New Jersey police notified one of the officers that they had stopped a car and were holding the accused. It was later learned that the accused had been physically present in this jurisdiction throughout the interim between the initial attempt to execute the warrant and the time he was arrested in New Jersey, residing in a home owned by his mother and spending many of his evenings helping a friend in her carry-out shop. On

---

**16.** There are, of course, a number of possible reasons for not arresting a narcotics offender at the scene of a sale to an undercover agent, including the need to protect the identity of informants and undercover agents who have not yet "surfaced," the possibility of continuing the operation in order to implicate higher-ups in the illegal distributive chain, or a concern for the safety of informants or agents in the vicinity of potentially dangerous criminals.

**17.** It would be absurd to hold that the agents were *required* to arrest appellant at the time of the illegal narcotics transaction. Besides the fact that there are a number of reasons why

police may not wish to act immediately, *e. g.,* in order to protect the identity of informants or to apprehend other individuals involved in the distributive chain, such a rule would make a game out of the criminal process. Even if, utilizing our best hindsight, we were to conclude that the agents probably ought to have made an arrest at the time of the sale, to hold that the charges against appellant should be dismissed because appellant successfully evaded police for 13 months thereafter would surely be to let the criminal go free because the constable had blundered.

these facts, the district court held that the attempt to locate the defendant in order to execute the warrant was "less than diligent." 243 F.Supp. 830, at 832.

The crucial difference between *Godfrey* and the case *sub judice,* however, is that, in the latter, the police never knew the identity of the accused-to-be and had nothing to go on save Agent Logan's description. Appellant points out that the agents never checked BNDD or Metropolitan Police photographic files and, apparently, did not question the owners of the two automobiles associated with the illegal narcotics transaction. We cannot say from these facts that the agents failed the *Godfrey* diligence test, however. The BNDD files contained approximately 5,000 photographs; the Metropolitan Police files approximately 55,000. Both filing systems were organized so that a name was required in order to locate a particular photograph. We therefore think it unreasonable to characterize the agents' efforts as less than diligent merely for failure to consult these photographic files.[18]

The record adequately demonstrates that Agents Logan and Jackson each made an honest effort to locate and apprehend the "unknown individual" who had participated in the illegal sale. Logan attempted to deal further with Nicks, but Nicks refused (Tr. II 87, 90). Logan also attempted to identify appellant through Nicks and through informant Fleming (Tr. II 79–80, 87–90), and, like Agent Jackson, he searched for appellant in the 7th and T Street area. In addition, Agent Jackson questioned seven or eight informants and directed other agents to help (Tr. II 118, 120).

On November 24, 1971, the day Logan inadvertently uncovered the photograph, he immediately went to work on his fresh investigative lead. One week later, Lloyd Lee, the defendant in the search case, provided a nickname (Tr. II 58–60). Logan then verified that identification and obtained appellant's true name through BNDD and police files (Tr. II 58–60). At this point, Logan was able to obtain an arrest warrant, which he executed the following day (Tr. I 15, 49; Tr. II 58–60). From these facts, we conclude that the agents pursued appellant with the necessary diligence after Agent Logan had surfaced within the four-month, rule-of-thumb period.

### 3. The Requirement of Prejudice

Under the test articulated in *Robinson, supra,* perhaps the most important recent case in the *Ross* line, even if we were to conclude that the delay in appellant's arrest was unreasonable and that the agents' conduct was less than diligent, "[it] would not end the matter; it would simply chalk up one mark against the Government." *United States v. Mills,* 149 U.S.App.D.C. at 355, 463 F.2d at 301. Under the test enunciated in *Ross* and refined in cases like *Robinson,* appellant still has the burden of demonstrating some "special circumstances," or some prejudice to his case. Such a showing requires more than a general assertion that the accused has difficulty remembering the day of the illegal transaction.

■ In *Robinson v. United States, supra,* the accused denied having committed the alleged offense, but testified that he could not recall his whereabouts

---

**18.** It is not entirely clear why the agents did not question the owners of the Pontiac and Buick. The record shows that the registrations were checked, and that surveillance failed to turn up either car (Tr. II 118). We cannot say, therefore, that the failure to follow a single possible investigative lead to its ultimate conclusion rendered the investigation less than diligent. The *Godfrey* diligence requirement does not require police to drop all else in order to concentrate totally on apprehending a single individual. Nor, we believe,

does it require this court painstakingly to review police conduct to determine, with the aid of judicial hindsight, whether the agents might have employed their investigative resources in a more efficient manner. The crucial difference between this case and *Godfrey* is that, in the latter case, the police simply gave up after they failed to find Godfrey where they expected to find him even though he had been identified and remained available in his mother's house throughout the entire period of the delay.

during the relevant period. He also testified as to his employment during the period, although he failed to call his employer as a witness, and further claimed that his then-deceased sister, with whom he had been living at the time of the offense, could have established an alibi. On these facts, the court held that the appellant had failed to demonstrate that his ability to present a defense had been prejudiced by the pre-arrest delay, and stated, "Any inference that harm did result is negated when the accused testifies in detail or brings forward an alibi witness, or perhaps even when he holds a steady job." 148 U.S.App.D.C. at 63–64, 459 F.2d at 852–53. Thus, after *Robinson,* the *Ross* requirement that the accused present a "plausible claim" of prejudice is not satisfied by the mere assertion that the accused cannot remember his whereabouts on the day of the offense or by the "slender hope" that a witness, now unavailable, might have been able to come forth with testimony favorable to the defense. *Id.* 148 U.S. App.D.C. at 65, 459 F.2d at 854. In brief, without a more definite showing of prejudice, "the probability of damage to appellant's ability to defend himself [is] not significant enough to warrant upsetting his conviction." *Id.* Also relevant to the issue of prejudice is the quality of the Government's proof in the particular case. *Id.* The principal concern of the *Ross* line of undercover narcotics cases is, again, the "lurking danger of misidentification" where the Government's case consists solely of testimony by a single eyewitness recollecting an event that occurred over a very short time, often in the very distant past.

■ Applying these principles to the instant case, we begin by noting that appellant relied at trial upon two defenses, alibi and misidentification.[19] The Government presented three witnesses to support the identification of appellant as the seller of the illegal drugs. At the first trial, appellant attempted to establish an alibi, relying upon his mother's testimony (II Tr. I 91–93). At the second trial, appellant subpoenaed his employer to support his alibi defense (Tr. II 16, 296, 299).[20] Moreover, appellant testified in detail about his employment and specifically denied being present on October 21, 1970, at each location mentioned by the three Government witnesses. Appellant called Fleming and Nicks, who confirmed that the illegal transaction took place but denied that appellant was a participant. Under these circumstances, appellant's claim of prejudice does not warrant upsetting his conviction. The record demonstrates that the failure of appellant's defense turned not on the expressed inability of appellant's witnesses to remember his whereabouts on October 21, 1970, but on the credibility of their statements that appellant was not present during the narcotics sale.[21]

---

19. Appellant did not testify either at the hearing on his motion to dismiss or at his first trial.

20. The employer did not appear for reasons unrelated to the pre-arrest delay (Tr. II 307). In the wake of *Robinson,* it is significant that, unlike the defendant in *Ross,* appellant appears to have remained steadily employed at least until 1973 (Tr. II 299–300; Sent. Tr. 23). *Robinson* held that steady employment may negate the inference that an accused has been unduly prejudiced by delay which damages his ability to remember his whereabouts during the time of the narcotics transaction. For a list of cases in which this claim has been made, *see Robinson,* 148 U.S.App.D.C. at 63 n. 31, 459 F.2d at 852 n. 31. The gist of the court's concern has been that

the people in this subculture simply do not have desk pads and social calendars to assist them in determining where they were at a particular time many months before. They live from day to day and one day is very much like another.

*Powell v. United States,* 122 U.S.App.D.C. 229, 232, 352 F.2d 705, 711 (1965).

21. We have recognized that the inability of an accused or his witnesses to recall past events in detail can affect credibility insofar as the jury must contrast general denials with detailed testimony by police officers whose memories are refreshed by notes or other records. We do not find that appellant was significantly prejudiced in this regard, however, since he did produce witnesses who testified that he was not at the scene of the illegal transaction.

As such, the matter was properly left to the jury.

Finally, this case is distinguished from "typical" *Ross*-type cases by another factor: the nature and strength of the undercover agents' identification. The general pattern of the *Ross* cases is that of an agent, often relatively inexperienced, who goes undercover for an extended period of time in order to participate in as many narcotics transactions as possible. When he surfaces, a flood of warrants may issue [22] and a large number of suspected narcotics offenders may be arrested and charged solely on the basis of the undercover agent's testimony. Often the agent has had but a single brief encounter with each individual among the many. In *Ross,* for example, the agent had been involved in 125 transactions—so many, in fact, that he required a notebook to refresh his memory before testifying as to a single transaction. 121 U.S.App.D.C. at 235, 349 F.2d at 212. It is the danger of misidentification inherent in this kind of mass-production law enforcement which underlies much of this court's concern for pre-arrest delay as expressed in *Ross* and its progeny.

We find that the danger of misidentification is minimized in this case by several factors. First, Agent Logan went undercover for but a single transaction.

Moreover, although Agent Logan participated with appellant in only a single narcotics transaction,[23] his identification appears to have been made, insofar as possible, in adherence with the factors set forth in *Woody v. United States,* 125 U.S.App.D.C. at 195 n. 6, 370 F.2d at 217 n. 6: he took fairly detailed notes, gave a detailed description of appellant and his dress, elicited a written corroborative statement from the informant, and personally confronted the accused at the time of the arrest. Secondly, Agent Logan's testimony was substantially corroborated by the testimony of Agents Jackson and Marshall, assigned to observe his activities with informant Fleming. Third, Agent Logan identified appellant from a group of approximately 350 photographs, and even appellant's clothing in the photograph partially matched the description Logan had given immediately following the transaction. Neither Jackson nor Marshall was present during Logan's identification, and neither saw the photograph, yet their observations both tended to corroborate Logan's identification.[24]

In conclusion, we hold on these facts that appellant has failed to demonstrate that the delay between the offense and his arrest was reasonably avoidable or that it prejudiced his ability to present a defense. We find that the "lurking danger of misidentification" in

Fleming testified that the other person who participated in the transaction was not present in the courtroom (Tr. II 191), although he confirmed that Logan had purchased heroin from "[a]nother dude" for $300 (Tr. II 190–93). When asked who the other person was, Fleming relied on his fifth amendment privilege. Upon being instructed to answer the question, Fleming replied that he knew the man but did not know his name (Tr. II 209–10). His testimony was impeached by prior inconsistent statements and prior convictions for other offenses (Tr. II 195, 196–97, 202, 207, 214, 226).

Nicks testified that he did not know appellant at the time of the alleged sale. Although he admitted that he saw the money change hands, he claimed that he did not know why it was being passed (Tr. II 270, 272–73).

**22.** *See, e. g., Roy v. United States,* 123 U.S. App.D.C. 32, 33, 356 F.2d 785, 786 (1965) (51 warrants); *Powell v. United States,* 122 U.S. App.D.C. 229, 232, 352 F.2d 705, 708 (1965) (102 warrants); *Jackson v. United States,* 122 U.S.App.D.C. 124, 125, 351 F.2d 821, 822 (1965) (25 warrants); *Ross v. United States, supra,* 121 U.S.App.D.C. at 235, 349 F.2d at 212 (51 warrants).

**23.** Logan attempted through Nicks to deal in repeat sales, but was refused (Tr. II 87, 90).

**24.** Agent Logan identified appellant from four separate observations of him on October 21, 1970: (1) at the Golden Cue; (2) at 9th and M Streets; (3) back at the Golden Cue; and (4) at the site of the drug transaction (Tr. II 98, 100–05, 112, 115). Agent Marshall corroborated by description both Jackson's and Logan's identifications from his observations of appellant at the Golden Cue and at 9th and M Streets (Tr. II 135–36).

this case is substantially less than in more typical *Ross* mass-production arrest situations. We therefore conclude that the trial judge properly refused to dismiss the indictment.

### III. Speedy Trial

■ Appellant contends that the delay of approximately 13 months between the date of the arrest and the date of trial constituted a violation of his sixth amendment right to a speedy trial.[25] We conclude that a significant portion of the 13 month period can be attributed to the defendant's widely scattered motions and numerous changes of counsel; in addition, appellant has failed to demonstrate that he has been so prejudiced by the delay that his indictment should be dismissed. Accordingly, we hold that the trial judge correctly declined to dismiss the indictment for infringement of appellant's right to a speedy trial.

■ The right to a speedy criminal trial has been variously described as "one of the most basic rights preserved by our Constitution,"[26] as "amorphous" and "slippery,"[27] and as a right "more honored in the breach than the observance."[28] The Supreme Court attempted to inject some order into what had become a confused area of the law in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Realizing the difficulty of articulating a firm and fast time limit beyond which a defendant's right to a speedy trial would be deemed violated, the Court articulated "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 530, 92 S.Ct. at 2192. In order to provide a framework for balancing, the Court identified four factors to be weighed in determining whether an accused has been denied his right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant resulting from the delay. *Id.* at 530, 92 S.Ct. 2182. None of these related factors is necessarily determinative. Rather, they are to be "considered together with such other circumstances as may be relevant." 407 U.S. at 533, 92 S.Ct. at 2193. The *Barker* test is thus intended not as an easy, mechanical answer to complex questions, but as a framework for "a difficult and sensitive balancing process." *Id.* In short, the right is necessarily relative and depends upon the facts and circumstances of each case. *Beavers v. Haubert,* 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1905). We turn now to the facts in the instant case.

Appellant was arrested on December 15, 1971. The preliminary hearing was held on February 15, 1972, when appellant's second defense counsel was appointed. The indictment was filed on May 11, 1972, and on May 18, 1972, counsel filed a motion to dismiss the indictment based on delay in arrest. During this period, appellant was free on bond except for a brief period following the execution of a parole violator warrant. Appellant was arraigned on May 25, 1972. At that time he changed attorneys for a second time. The motion to

---

**25.** Appellant's second trial commenced on June 10, 1974, approximately 16 months after his first trial ended in a mistrial. Although such a delay, chargeable to the Government, could give rise to an additional claim of denial of a speedy trial, a substantial portion of this delay is directly attributable to the fact that appellant took flight. It was therefore necessary to issue a bench warrant and to petition for a writ of habeas corpus *ad prosequendum* after appellant was apprehended and incarcerated in Maryland. Perhaps for this reason, appellant bases his sixth amendment claim solely on the delay preceding his first trial.

**26.** *Klopfer v. North Carolina,* 386 U.S. 213, 226, 87 S.Ct. 988, 995, 18 L.Ed.2d 1 (1967), *quoted in United States v. Brown,* 172 U.S. App.D.C. 92 at 96, 520 F.2d 1106, at 1110 (1975).

**27.** *United States v. Lara,* 172 U.S.App.D.C. 60, at 63, 520 F.2d 460, at 463 (1975), *quoting Barker v. Wingo,* 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**28.** Amsterdam, "Speedy Criminal Trial: Rights and Remedies," 27 *Stan.L.Rev.* 525 (1975). This article provides an insightful discussion of recent developments in this area.

dismiss was heard on July 26, 1972, after a one-month continuance requested by the Government.

Defense counsel next moved to suppress Agent Logan's testimony under the Jencks Act, 18 U.S.C. § 3500 (1970), and to suppress Fleming's testimony on the ground of physical or mental incompetency. These motions were heard on October 20, 1972, the day the case had been set for trial. The court then continued the trial for two months.

On December 19, 1972, the case was called for trial. Appellant again moved to change defense counsel, but the motion was denied. At this point, the Government requested and received a continuance because the prosecutor was involved in another trial. Thereupon Judge Robinson transferred the case to Judge Parker, who called the case for trial the following day, December 20, 1972. The trial was again delayed, however, because appellant's counsel filed a new motion to suppress the identification testimony and a government witness was missing. The case was therefore continued for a hearing on appellant's motion, and a status call was set for January 12, 1973. The case was certified back to Judge Robinson, the original trial judge. On January 9, 1973, three days before the scheduled status call, appellant's counsel filed a motion to dismiss the indictment for lack of a speedy trial. At the January 12th status call, the trial was set for February 5, 1973, the day when it actually began.[29] For the sake of clarity, these events are summarized in the following table:

## Proceedings Prior to First Trial

| Date | Action |
| --- | --- |
| December 15, 1971 | Jones arrested and presented before United States Magistrate. First defense counsel appointed. Bond set at $1000. Bond posted. |
| February 15, 1972 | Preliminary hearing held. Probable cause found. Another defense counsel appointed. |
| March, 1972 | Parole violator warrant executed. |
| May 11, 1972 | Indictment filed. |
| May 16, 1972 | Bond continued by Magistrate. |
| May 18, 1972 | Counsel filed motion to dismiss based on pre-arrest delay. |
| May 25, 1972 | Arraignment. Defense counsel relieved on motion and new counsel appointed. Bond continued. Defense counsel instructed to notify court when ready for status call. |

29. A mistrial was declared on February 8, 1973, after the jury was unable to reach a verdict.

848 

## Proceedings Prior to First Trial—Continued

| Date | Action |
| --- | --- |
| June 5, 1972 | Jones reinstated on parole. |
| June 29, 1972 | Government received continuance of hearing on motion to dismiss. |
| July 26, 1972 | Motion to dismiss heard and denied. |
| October 20, 1972 | Motion to strike testimony pursuant to 18 U.S.C. § 3500(d) filed. Case called for trial. Motion to strike testimony heard and denied. Motion to suppress Fleming's testimony heard; Fleming refused to testify. Trial continued until December 19, 1972. |
| December 15, 1972 | Appellant filed petition for writ of habeas corpus ad testificandum for Edward Fleming; writ issued. |
| December 19, 1972 | Case again called for trial. Appellant again moved to change defense counsel. Motion heard and denied. Government requested continuance because prosecutor involved in another trial. Motion heard and granted. Case referred to Judge Parker for trial. Case continued by Judge Parker until next day. |
| December 20, 1972 | Case called for trial. Motion to suppress identification testimony filed with leave of court. Government witness absent. Case certified back to Judge Robinson. Status call set for January 12, 1973. |
| January 9, 1973 | Motion to dismiss for lack of speedy trial and denial of due process. |
| January 12, 1973 | Status call; trial set for February 5, 1973. |
| February 5, 1973 | Motion to dismiss heard and denied. Motion to suppress identification heard and denied. Trial began. |
| February 8, 1975 | Jury unable to reach verdict. Mistrial. |

We now turn to consider these facts in light of the test articulated in *Barker.*

## A. The Length of the Delay

█ We believe the appropriate starting point for computing the length of the delay is the date of appellant's arrest, December 15, 1971. *Coleman v. United States,* 142 U.S.App.D.C. 402, 405, n. 4, 442 F.2d 150, 153 n. 4 (1971). Approximately 13 months elapsed before the beginning of appellant's first trial. This factor, the presence of some appreciable delay, is, of course, a threshold requirement. We have said that cases involving delays of more than six months are properly subject to inquiry and require justification, *United States v. Ransom,* 151 U.S.App.D.C. 87, 88, 465 F.2d 672, 673 (1972), and that a claim has prima facie merit when more than a year elapses between arrest and trial. *See United States v. West,* 164 U.S.App. D.C. 184, 186–87, 504 F.2d 253, 255–56 (1974); *Hedgepeth v. United States,* 124 U.S.App.D.C. 291, 294–95, 364 F.2d 684, 687–88 (1966). Although the length of the delay here is not itself sufficient, absent other circumstances, to compel the conclusion that appellant has been denied a speedy trial, *see, e. g. United States v. Brown,* 172 U.S.App.D.C. 92, 520 F.2d 1106 (1975), we conclude that the delay of approximately 13 months satisfies the threshold requirement and compels us to look further.

## B. The Reason for the Delay

We have in the past distinguished between delays deliberately sought by the Government in order to secure some tactical advantage, delays resulting from the operation of the system, and those resulting from the defendant's own defense tactics. Respecting delays directly attributable to governmental conduct, we have said "[w]henever the Government's action at any stage of the proceeding indicates bad faith, neglect, or a purpose to secure delay itself or some other procedural advantage, the resulting delay is not justified." *United*

*States v. Lara,* 172 U.S.App.D.C. 60, 64, 520 F.2d 460, 464 (1975), *quoting United States v. Bishton,* 150 U.S.App. D.C. 51, 54, 463 F.2d 887, 890 (1972). We find no indication, however, that the Government deliberately sought to delay this case. At most, only about two months of the delay can be attributed to Government requests for continuances. We find no evidence of "court shopping" or any attempt to delay the proceedings in order to aid in securing a conviction. *See, e. g., Barker v. Wingo, supra* (delay in order to secure accomplice's testimony after his conviction); *United States v. Lara, supra* (delay where Government chose to seek dismissal in District of Columbia and to begin anew in Florida apparently seeking more favorable court).

█ This is not to say that only deliberate delays are chargeable to the Government. The Supreme Court has held that delays due to the operation of the system also must be placed at the Government's door, stating in *Barker v. Wingo*:

> A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process. . . . [T]he rule we announce today, which comports with constitutional principles, places the primary burden on the courts and the prosecutors to assure that cases are brought to trial.

407 U.S. at 527, 529, 92 S.Ct. at 2190 (footnotes omitted). The Government thus has the responsibility to seek a prompt trial after the passage of a considerable length of time; failure to do so will justify placing a heavier burden on the Government in arguing that the right to a speedy trial has not been abridged. *Hedgepeth v. United States,* 124 U.S.App.D.C. 291, 294–95, 364 F.2d 684, 687–88 (1966). In short, in assessing the reasons for a substantial delay,

> overcrowded Courts should be weighed less heavily [than Government's deliberate attempt to delay] "but neverthe-

less should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant."

*United States v. Perry*, 353 F.Supp. 1235, 1238–39 (D.D.C.1973), *quoting Barker v. Wingo, supra.*

The facts indicate that normal delay inherent in the system accounted for the initial delay of approximately the first five months prior to appellant's arraignment. The two-month delay which followed is due partially to appellant's second change of counsel and the need to hear his first motion to strike testimony (one month is directly attributable to the Government's request for a continuance).

On the next trial date, October 20, 1972, the case was again continued, apparently because it became necessary on that day to hear appellant's motions to suppress Logan's and Fleming's testimony. When the case was next called for trial on December 19, 1972, appellant again moved to change defense counsel. Little delay can be attributed to this motion, since it was denied, and the delay is most directly attributable to the Government's request for a continuance because the prosecutor was involved in another trial; but the prior postponement was at least partially responsible for creating this conflict. At this point, the case was transferred to another judge, who called it for trial the following day. Defendant's counsel again filed a suppression motion, however, and the case was again continued for a hearing on the new motion.

It is impossible to assign "fault" for these delays with mathematical precision. Some portion must be attributed to appellant's suppression motion; some undoubtedly is attributable to crowded court dockets. The Government argues that "[t]he bulk of the delay was . . . attributable to appellant's widely dispersed motions, some of them made on the dates set for trial. The record suggests that appellant, by such tactics, including moving for new

counsel on the day of trial, deliberately sought to delay the trial." Government Br. at 31 (citations omitted). We do not find that appellant deliberately sought to delay the trial. On the other hand, appellant's diverse motions obviously accounted for some portion of the delays. We do not believe that the time required to rule on these motions was inordinate. *Cf. United States v. Brown, supra* (delay of over four years; two years, four months required for final disposition of motion to suppress). Quite simply, we are confronted with a situation in which, to borrow the words of one astute observer:

> delays compound delays; the more frequently a trial has to be rescheduled, the more likely it is that one of the many accidents of life will occur on a second or successive trial date and require an additional postponement.

*Amsterdam, supra*, at 531 (citation omitted). Thus, although some portion of the entire delay surely is attributable to the operation of the system, and must therefore weigh against the Government, we do not believe that the length of time was unreasonable, given the circumstances of this case, especially appellant's numerous motions and several attempts to change counsel during the course of the proceedings. This is not to say that a defendant should be penalized for exercising his constitutional rights through making motions to the court, but such procedures obviously take time. A defendant should not be able to take advantage of a delay substantially attributable to his own trial motions when the court acts upon them within a reasonable period of time. Otherwise, "the demands of due process and the requirement of a speedy trial [would] conflict." *United States v. Brown, supra* (MacKinnon, J., Statement of Reasons in Support of *Sua Sponte* Motion to Consider the Case En Banc at 1). Under these circumstances, we find that the delay of 13 months between appellant's arrest and the date of his trial was not so unreasonable, absent a substantial showing of

prejudice, as to require that the charges against appellant be dismissed.[30]

## C. The Defendant's Assertion of the Right

A third factor enunciated by the Supreme Court in *Barker v. Wingo* was whether the defendant had requested a speedy trial. Prior to *Barker*, many courts had adopted the "demand rule," by which a criminal defendant tolled, sometimes forfeited, his right to speedy trial unless he demanded one.[31] *Barker* rejected this form of the demand rule and held instead that "the defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." 407 U.S. at 528, 92 S.Ct. at 2191.[32]

Appellant asserted his right to a speedy trial on January 9, 1973, approximately one year after his arrest and only one month before the trial actually began. Appellant relies on *United States v. Holt*, 145 U.S.App.D.C. 185, 448 F.2d 1108, *cert. denied*, 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 257 (1971), to argue that a defendant need not demand a speedy trial where delay has run for more than a year.

The Government argues in response that appellant's failure to assert his sixth amendment right until twelve months after his arrest reflects his satisfaction with the pace of the litigation. Government Br. at 31.

■ Although there can be no doubt that appellant did assert his right, we believe that appellant's assertion, coming as late and as close to the time when the trial actually began as it did, does not weigh heavily in his favor.

## D. Prejudice Resulting from Delay

The Supreme Court in *Barker v. Wingo* identified three interests which the sixth amendment right to a speedy trial is designed to protect:

(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.

407 U.S. at 532, 92 S.Ct. at 2193.

Appellant bases his allegations of prejudice on the general restrictions on his freedom and anxiety associated with being charged with a criminal offense and on his assertion that the delay impaired his ability to present a defense.[33] We

---

**30.** The Supreme Court decided in *Strunk v. United States*, 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973), that once it is determined that a defendant has been denied a speedy trial, "dismissal must remain . . . the only possible remedy." *Id.* at 440, 93 S.Ct. at 2263. For a critical view of this result, *see* Amsterdam, *supra*, at 532–39.

**31.** Amsterdam, *supra*, at 539–40.

**32.** *Barker* settled the issue as to the validity of the "demand rule," which had held that a criminal defendant could not obtain dismissal of his prosecution for want of a speedy trial unless he had previously demanded a speedy trial and not received it. Under *Barker*, "the defendant's assertion of a failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." 407 U.S. at 528, 92 S.Ct. at 2191.

This result is severely criticized in Amsterdam, *supra*. The author states that the purpose of the demand rule was to compel a defendant to go on record with a request for a speedy trial while it was still possible for him to get one.

To convert a rule having this function into a factor for consideration among many factors in determining whether and when the right to speedy trial has been denied is equivalent to repealing the law requiring motorists to drive on the right-hand side of the road and decreeing instead that, in tort suits following motor vehicle accidents, it shall be a "factor" relevant to the defendant's liability whether he was driving on the right or the left.

*Id.* at 540.

**33.** Appellant was incarcerated for a short time on a parole violator warrant, but the brevity of his confinement distinguishes his case from others recently decided in this circuit. *Compare United States v. Brown*, 172 U.S.App.D.C. 92, 520 F.2d 1106 (1975); *United States v. Calloway*, 164 U.S.App.D.C. 204, 505 F.2d 311 (1974); *United States v. West*, 164 U.S.App.D.C. 184, 504 F.2d 253 (1974); *United States v. Rucker*, 150 U.S.App.D.C. 314, 464 F.2d 823 (1972); *with United States v. Cooper*, 164 U.S.App.D.C. 191, 504 F.2d 260 (1974).

have already discussed appellant's assertion that his ability to present a defense was impaired with respect to the delay between the offense and the arrest; consequently, we find it unnecessary to retrace our steps here.[34] It is sufficient to say, contrary to appellant's assertion that "[h]e could not present witnesses who could testify to his actual whereabouts on the day in question," Appellant's Br. at 29, that appellant called two witnesses, Nicks and Fleming, who testified that he was not present at the narcotics sale, and another witness, his mother, who testified that he was somewhere else. Appellant has not alleged that any witnesses became unavailable due to the delay. See Barker v. Wingo, supra, at 532, 92 S.Ct. 2182. Appellant's defense thus failed not because of his witnesses' or his own lack of memory, but because the jury chose not to believe them.

Respecting appellant's allegations of prejudice resulting from the normal anxiety and concern experienced when one is charged with a serious crime, we note that appellant was free on bond and, consequently, we believe that his anxiousness and concern were minimized. See Smith v. United States, 135 U.S.App. D.C. 284, 288, 418 F.2d 1120, 1124 (Wright, J., dissenting), cert. denied, 396 U.S. 936, 90 S.Ct. 280, 24 L.Ed.2d 235 (1969). In addition, appellant testified that he led a normal life (Tr. II 319–20, 322–23, 325–27), and he apparently remained employed until 1973 (Tr. II 299–300; Sent. Tr. 2–3).

 Under these circumstances, we cannot say that appellant has demonstrated a "reasonable possibility" that prejudice resulted from the delay. United States v. Rucker, 150 U.S.App.D.C. 314, 464 F.2d 823, 825 (1972); United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108, 1110 (1971).

### E. Weighing the Factors

Operating in a field where the only possible remedy is "the draconian reme-

dy of dismissal of the indictment," we have been reluctant to find that an accused's right to a speedy trial has been violated absent a credible showing that he has been substantially prejudiced by the delay. See, e. g., United States v. Douglas, 164 U.S.App.D.C. 144, 150 n. 7, 504 F.2d 213, 219 n. 7 (1974) (Bazelon, C. J., concurring). In addition to appellant's failure to demonstrate any substantial prejudice resulting from the delay, we find that the other factors articulated in Barker do not weigh heavily in appellant's favor. First, we find nothing to indicate that the Government deliberately sought delay. Secondly, contrary to the situation in United States v. Brown, supra, we find here no substantial block of time during the proceedings when the trial might have been concluded, and no unconscionable delay in ruling on appellant's motions. The length of the delay was not inordinate, given the nature of the case, the number of motions filed, and appellant's frequent changes of counsel. Although delays due to the operation of the system are subject to scrutiny and must be justified, we find that appellant must share responsibility for these delays. Crowded dockets certainly were partially responsible, but appellant's widely dispersed motions aggravated the problem, and delays compounded delays. In this situation it is impossible to assign "fault" for the delay except to say that it was not all due to the operation of the system. Moreover, we note that the district court did attempt to guard appellant's sixth amendment right by transferring his case to another judge for immediate trial. Finally, appellant did not assert his right until twelve months after his arrest, only one month before the trial actually began. For these reasons, we conclude that appellant was not denied his right to a speedy trial.

### IV. Conclusion

In conclusion, we think it desirable to reiterate those elements of this case

---

**34.** This discussion appears in Part II(B)(3) of this opinion.

which we find particularly important. Respecting appellant's first contention, that his indictment should be dismissed because the delay between the offense and his arrest was unreasonable and prejudiced his ability to put on a defense, we hold that the bulk of the delay was not purposeful, but resulted from appellant's successful evasion of the agents who diligently pursued him; hence, the delay was not reasonably avoidable. In addition, appellant failed to demonstrate that the delay significantly prejudiced his defense. The "lurking danger of misidentification," the fundamental concern underlying the *Ross* line of narcotics cases, was therefore minimized.

Respecting appellant's second contention, that he was denied his right to a speedy trial, we note that Congress has recently enacted the Speedy Trial Act of 1974 (Pub.L. No. 93–619), effective July 1, 1975, which prescribes time periods during which proceedings in criminal cases are to take place. 18 U.S.C. § 3161, et seq. Certain delays are excluded, however, such as those necessarily encountered due to interlocutory appeals, or hearings on pretrial motions. *See* 18 U.S.C. § 3161(h). Although appellant's trial was completed long before the passage of the Act and we therefore must analyze his speedy trial claim in light of the standards articulated by the Supreme Court in *Barker v. Wingo, supra,* we discern in the Act congressional acknowledgment of many of the factors which we have found determinative in this case.

We hold that the length of the delay between appellant's arrest and trial was not unreasonable, given the circumstances of this case, especially the number of motions filed and appellant's changes of counsel. Although we recognize that some of the delay resulted from the normal operation of the system, we think appellant's diverse and often delayed motions are also partly responsible. We think the court acted on appellant's motions with reasonable promptness and see no substantial block of time during the course of the proceedings which might have allowed appellant's trial to be concluded earlier. Moreover, we are not convinced that appellant was substantially prejudiced by the delay.

For these reasons, we conclude that appellant's pre-arrest delay and speedy trial claims must fail.

*Affirmed.*