Louis E. CAMPBELL, Appellant,

v.

UNITED STATES, Appellee.

No. 11160.

District of Columbia Court of Appeals.

Argued Sept. 21, 1977.

Decided Aug. 29, 1978.

Kenneth R. West, Chevy Chase, Md., for appellant.

Thomas G. Corcoran, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and William D. Pease, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, YEAGLEY and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted by a jury of second-degree murder while armed. D.C. Code 1973, §§ 22–2403, –3202. He contends (1) that the 17-month delay between his arrest and trial denied him his Sixth Amendment right to a speedy trial, and (2) that it was error to admit certain testimony into evidence under the state of mind ex-

ception to the rule against hearsay. While we reject the speedy trial contention, we agree with appellant on certain aspects of the evidentiary issue and reverse.

## I

On the afternoon of January 24, 1975, appellant was discovered in the apartment of the decedent, Diane Eads. He was leaning over the body of Eads, who had been fatally shot. The decedent lay on her back on the bed with her feet on the floor. A telephone with a bloody fingerprint was on the table by her bed. The telephone cord extended from the table, over her left foot and under her right foot. A .38 caliber Smith & Wesson revolver with one empty and five live rounds and a holster, were on the bed.

The government established that the cause of death was a bullet wound of the wrist and chest. The entry wound and the path of the bullet indicated that the decedent had been shot at close range while she was either standing or sitting erect.

A written statement was obtained from appellant that day. In it, he said that on January 21 he had returned home unexpectedly to the apartment he and the decedent were sharing to find her with a former boyfriend, Percell West. Appellant and the decedent previously had quarrelled over her relationship with West, as well as over her relationships with other men. On the day of the shooting appellant's statement continued, appellant informed the decedent that he was leaving her. An argument ensued and the decedent attempted to stop the appellant from getting dressed to go to his job as a Special Police Officer (he was qualified as an expert in the use of his revolver). Appellant stated that he had just finished loading his pistol when the decedent started hitting him, and that her blows accidentally caused the gun to discharge. When the gun fired, the decedent fell on the bed. Appellant called an ambulance; he was found crying over her body when the police arrived.

The government's firearms expert indicated that the initial entry wound on the back of the decedent's hand was not a contact wound and had been made from a distance of approximately three inches. He testified that firing the weapon required a three and one-half pound pull on the trigger if the revolver was cocked, and over eight pounds of pull if it was not. The weapon could not be loaded while cocked. Appellant testified that he had not cocked the weapon on the day in question. Asked whether the weapon would fire if one person struck it while another held it with the hammer down, the government's expert answered that it could not be done with appellant's revolver.

## II

Appellant was arrested on the day of the shooting, and was released on bond twelve days later. He remained at liberty throughout the proceedings which culminated in his conviction. Trial was set for July 16 but was continued to August 13 on an unopposed government motion. The original indictment charged appellant with both voluntary and involuntary manslaughter. On August 13, appellant's motion to dismiss the indictment for duplicity was granted, and the government noted an appeal. On August 26 we issued our decision in *United States v. Bradford*, D.C.App., 344 A.2d 208 (1975), adversely deciding the same issue presented by the government's appeal in appellant's case. The government, however, did not move to dismiss its appeal until October 8.

Five months later, on March 19, 1976, appellant was reindicted and charged with second-degree murder while armed. New defense counsel was appointed. The case was set for May 4 for a status hearing. On May 14, appellant moved to dismiss for lack of a speedy trial; his motion was denied. On June 23, 1976, 17 months after his arrest, appellant was convicted.

While the right to a speedy trial is a fundamental right guaranteed by the Sixth and Fourteenth Amendments, *Klopfer v. North Carolina*, 386 U.S. 213, 222–23, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), a showing of

more than mere delay is necessary to support a finding of constitutional violation. *Barker v. Wingo,* 407 U.S. 514, 530–31, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In *Barker,* the Supreme Court adopted a flexible balancing approach and identified the four principal factors which are to be assessed in analyzing a speedy trial claim: (1) the length of the delay; (2) the reasons for the delay; (3) appellant's assertion of his right; and (4) prejudice to the appellant. *Barker v. Wingo, supra,* at 530, 92 S.Ct. 2182; *accord, United States v. Calhoun,* D.C.App., 363 A.2d 277, 278–79 (1976).

### A. Length and Reasons for the Delay

■ The time period in the instant case was 17 months. While we have stated that a delay of a year or more between arrest and trial is sufficient to give prima facie merit to a claimed denial of the speedy trial right, *see Branch v. United States,* D.C. App., 372 A.2d 998, 1000 (1977), the delay still must be evaluated in light of the other factors enunciated in *Barker. Barker v. Wingo, supra,* 407 U.S. at 533, 92 S.Ct. 2182; *see, e. g., Rink v. United States,* D.C.App., 388 A.2d 52, 58 n. 11 (1978); *Bowman v. United States,* D.C.App., 385 A.2d 28, 30 (1978); *Strickland v. United States,* D.C. App., 389 A.2d 1325, 1333–1334 (1978) (HARRIS, J., separate opinion).

■ We note first that the delay from July 16 to August 13, 1975, resulted from a continuance sought by the government which was unopposed by appellant. Appellant's acquiescence in this delay results in minimal weight being accorded to that period. *Reed v. United States,* D.C.App., 383 A.2d 316, 319 (1978). The remaining 16 months resulted from the following factors: administrative delay, the taking of an interlocutory appeal by the government, and the development of expert ballistics testimony. While this entire 16-month period is chargeable to the government, it primarily constitutes "neutral" rather than deliberate delay and is to be weighed less heavily against the government. *See Rink v. United States, supra,* at 58; *United States v. Perkins,* D.C.App., 374 A.2d 882, 884 (1977).

■ We do note that the five months which elapsed between the dismissal of the government's appeal and appellant's reindictment appears to have been somewhat excessive, but we are not persuaded that it constituted an unreasonable delay. The government contends that much of this time was spent in obtaining and developing ballistics testimony. Since the ballistics evidence, together with the hearsay testimony which is discussed below, constituted the crux of the government's case, we cannot say that the government devoted an unreasonable amount of time to the accumulation of this evidence. Thus, we next examine two other factors: appellant's assertion of his right and any prejudice which he may have suffered as a result of the delay.

### B. Assertion of the Right

■ Appellant did not assert his right to a speedy trial until May 14, 1976, almost 16 months after his arrest. Since such assertions usually are accorded "strong evidentiary weight in determining whether the defendant is being deprived of the right", *Barker v. Wingo, supra,* 407 U.S. at 531–32, 92 S.Ct. at 2192, appellant's long silence greatly dilutes the significance which we attribute to his eventual assertion of the right to a speedy trial.

### C. Prejudice to the Appellant

■ The final factor which we must consider is whether appellant was prejudiced by the delay in this case. Prejudice must be measured in light of the interests which the Sixth Amendment is intended to protect. *See Barker v. Wingo, supra,* at 532, 92 S.Ct. 2182. These interests are: (1) to prevent oppressive pretrial incarceration; (2) to minimize the anxiety and concern experienced by the accused; and (3) to limit the possibility that the accused's defense will be impaired.

In the instant case, appellant was incarcerated for less than two weeks following his arrest and was free on bond for the pendency of the entire proceedings. While it may well be that appellant suffered some

anxiety and impairment of memory as a result of the 17-month period between his arrest and trial, we could not say that this prejudice was sufficiently serious, when considered in the overall context of this case, to warrant dismissal of the serious charges against appellant. *See United States v. Jones*, 173 U.S.App.D.C. 280, 297–98, 524 F.2d 834, 851–52 (1975). In particular, we note that the delay was not due to any bad faith on the government's part. We affirm the trial court's denial of appellant's motion to dismiss for lack of speedy trial.

## III

Appellant further assigns as error the introduction, over objection, of certain testimony which was accepted under the state of mind exception to the hearsay rule. The testimony consisted primarily of statements made by the decedent to friends and members of her family indicating that she was afraid of the appellant, that appellant had hit her and threatened her—once with a gun—and that appellant was suspicious and jealous of her relationships with other men. Several witnesses testified that they had seen the decedent with bruises on her body and that she had said that those bruises had been caused by appellant.

The state of mind exception to the hearsay rule allows the admission of extra-judicial statements to show the state of mind of the declarant if that is an issue in the case. The problem with admitting such statements is the risk that the jury will consider the victim's statements of fear as a true indication of a defendant's intentions or actions. This danger, however, must be balanced against the particularly relevant nature of state of mind evidence in cases involving claims of self-defense, suicide, or—as here—of accidental death. *See United States v. Brown*, 160 U.S.App.D.C. 190, 199, 490 F.2d 758, 767 (1973).

Much of the hearsay testimony elicited on the decedent's state of mind was highly probative as to the defense of accidental death which was raised by appellant and

properly was admitted. Nevertheless, certain statements which were admitted essentially were hearsay accounts of appellant's past conduct rather than depictions of the decedent's state of mind, increasing the danger of jury misuse. *See Shepard v. United States*, 290 U.S. 96, 103–06, 54 S.Ct. 22, 78 L.Ed. 196 (1933); *United States v. Brown, supra*, 160 U.S.App.D.C. at 207, 490 F.2d at 775, and cases cited therein.[1]

We are particularly troubled by Claudette (the decedent's sister) Eads' recitation of an incident (related to her by the decedent) in which appellant, in a jealous rage, allegedly held a gun to the decedent's head all night until she assured him she had not slept with another man. Despite the trial court's limiting instruction that this testimony was to be considered solely as evidence of the declarant's state of mind, there existed a substantial danger that the jury was unable to confine the statement to its proper purpose. *See Shepard v. United States, supra*, 290 U.S. at 104, 54 S.Ct. 22; *Bennett v. United States*, D.C.App., 375 A.2d 499, 502–03 (1977); *United States v. Brown, supra*, 160 U.S.App.D.C. at 196–99, 490 F.2d at 764–67. We therefore must balance the probative value of this statement against the prejudice to the appellant.

While the degree of prejudice depends on a number of factors, perhaps the single most important consideration may be whether the statement, if used by the jury for its improper purpose, is virtually dispositive of the case and extremely damaging to the position taken by the opponent of the admission of the evidence (the defendant). [*United States v. Brown, supra*, 16 U.S.App.D.C. at 199, 490 F.2d at 764. Footnotes omitted.]

The statement in question was highly damaging to appellant. It constituted evidence of the commission of a serious crime (assault with a dangerous weapon), and was the only testimony introduced which indicated that appellant was psychologically capable of deliberately shooting the decedent. It would be unrealistic to assume that the jury could have limited its consideration of

1. We are unpersuaded by the government's argument that some of these statements fall within in the spontaneous utterance exception to the hearsay rule.

this incident to the decedent's state of mind.

Additionally, we are concerned by the admission into evidence of hearsay statements of the following nature. Percell West, a former boyfriend of the decedent, testified, over objection, that the decedent had told him, "every time she got a phone call, [appellant] would beat her because he thought it was somebody calling her for a date or something." While such statements generally are admissible to show the state of mind of the victim-declarant, *see Gezmu v. United States,* D.C.App., 375 A.2d 520 (1977), West's testimony was highly prejudicial to appellant's case. The jurors reasonably could have surmised that the physical evidence (the bloody fingerprint on the phone) indicated that the decedent had been on the phone just prior to the shooting, and that this had provoked appellant into shooting her.[2] The introduction of numerous hearsay statements of a similar nature prompts us to conclude that greater caution should have been utilized by the trial court in determining whether the probative value of Claudette Eads' statement was not outweighed by its highly prejudicial impact.

The evidence against appellant was strong: (1) much of the physical evidence and expert testimony indicated that the killing could not have been accidental; (2) appellant's own statement and the personal observations of witnesses Claudette Eads and Percell West (testified to quite properly) indicated that appellant was jealous of the decedent's relationships with other men, and that at least one serious fight had ensued over this topic in which appellant had struck decedent;[3] and (3) statements made by the decedent indicating that she was afraid of appellant were admissible under the state of mind exception even though certain hearsay evidence of specific prior acts by appellant should have been

2. The decedent had spoken with her sister on the phone at approximately 1:30 p. m. on the afternoon of her death.

3. Included in the testimony which clearly was admissible against appellant was the following. Claudette Eads testified that a week or two before Christmas, she visited the decedent accompanied by a boyfriend. While Diane Eads

excluded. Nevertheless, error may be held to be harmless only if we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 764–65, 776, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). We cannot say with sufficient certainty that the evidence which properly was admitted was so overwhelming that appellant was not impermissibly and unduly prejudiced by the introduction of Claudette Eads' highly damaging hearsay statement as to appellant's holding of a gun to the decedent's head. Accordingly, we set aside the conviction and remand the case for a new trial.

*Reversed and remanded.*

was in the bedroom, Claudette and her boyfriend embraced in the living room. At that point appellant entered the apartment, mistook Claudette for Diane, and "put his hand on his gun like he was getting ready to draw it." Claudette called out, "Louis, it's me," and appellant, realizing who it was, laughed and desisted.