**Robert R. FOX, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 79–898.**

District of Columbia Court of Appeals.

Argued July 8, 1980.

Decided Sept. 22, 1980.

Tom Kirby, Washington, D. C., appointed by the court, with whom James W. Johnstone, Washington, D. C., was on brief, for appellant.

Steven C. Tabackman, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, John R. Fisher, and Cheryl M. Long, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and NEBEKER and FERREN, Associate Judges.

NEBEKER, Associate Judge:

After a jury trial appellant Fox was convicted of second–degree murder while armed, D.C.Code 1973, §§ 22–2403, –3202. Although appellant raises four issues on appeal, we need to discuss only two, both of which are evidentiary in nature.[1] He contends that the trial court erred in (1) admitting, over timely objection, the victim's hearsay statement that she feared the appellant, and (2) failing to grant motions of judgment of acquittal. We agree with appellant's first contention that the trial court committed reversible error in admitting inadmissible hearsay testimony relating to deceased declarant's fear of the appellant. In addition, we hold that the trial court properly denied the motions for judgment of acquittal as there was sufficient competent evidence from which a reasonable person could conclude beyond a reasonable doubt that the appellant was guilty. Accordingly, we reverse and remand for a new trial.

---

1. Appellant's other two contentions are that (1) the trial court abused its discretion in denying a continuance in order that appellant could secure an alleged key defense witness, and (2) he was denied a fair trial due to the cumulative effect of many allegedly prejudicial circumstances. In view of our disposition of this case, we need not reach these questions as they would be obviated by a new trial.

## I. FACTUAL BACKGROUND

Appellant Fox shared an apartment with the victim, his grandmother. At approximately 9:30 a. m. on October 22, 1977, appellant reported to his neighbors, the Crawfords, that his grandmother had been murdered and that a television and a radio had been stolen. The time of death was estimated by the medical examiner to be between 2:30 a. m. and 5:30 a. m. An examination at the scene of her death and a subsequent autopsy disclosed that death was caused by multiple head injuries, stab wounds to the chest, and strangulation.

Appellant testified at trial that he had been out drinking heavily on the evening of October 21, and when he returned to his apartment late that night, he was assaulted and robbed in the stairwell by an unidentified young black man. Appellant further testified that shortly after the mugging, appellant went up the stairwell to his grandmother's apartment whereupon this same unknown assailant rushed passed appellant into the apartment and grabbed his grandmother in the bathroom. Appellant testified he did not observe any infliction of physical harm. Appellant testified that he passed out from too much drinking and, upon awakening, discovered that his grandmother was dead; he also discovered that the radio and television were missing.

Appellant had given two versions of the incident to a police officer who arrived at the scene of the crime. In his first story, he made no mention of any intruder. After further questioning by the police officer, appellant changed his story to include an intruder in his apartment.[2] After appellant was arrested, he again changed his story in a written statement to police which recounted that an assailant had assaulted and

robbed appellant, but this had occurred outside the apartment in the stairwell.[3]

At trial, Mrs. Mills, a next-door neighbor of the deceased, testified that she frequently heard loud arguments between the appellant and the deceased. Mills further testified that during at least two arguments she had heard the deceased scream "murder-almost murder like" prompting her to phone the police. Mrs. Crawford, whose apartment is on the same floor as the deceased's, testified over objection that she heard the victim say she was afraid of the appellant.

Two photographs were taken of appellant at the time he was arrested. These photographs showed that appellant had markings around his neck and the imprint of a cross on his chest. A cross-shaped necklace, similar to the imprint, was found on the floor of the apartment shortly after the arrest.[4]

Further physical evidence introduced included a bloodstained shirt found on the bottom of a pile of clothing in appellant's closet. The blood type was unidentifiable.[5] While the shirt appellant was wearing at the time of the arrest was clean, appellant's tee shirt underneath this outer shirt had two bloodstains of type "O" blood. The parties stipulated that both the appellant and the victim had type "O" blood.

## II. INADMISSIBLE HEARSAY

■ The first question we must consider is whether Mrs. Crawford's hearsay testimony relating the victim's fear of appellant was erroneously admitted, and if so, whether this was reversible error. To be admissible, the hearsay testimony must fall within the state-of-mind exception to the hearsay rule. It is clear that the deceased declarant's extra-judicial statements of fear may be admitted under this exception

---

2. Appellant spoke briefly with a second police officer at the scene of the crime. In this conversation, appellant related, "You know, sometimes you do things when you get drunk."

3. In his written statement, appellant consistently used the word "we" as he described his walk down the hall to his grandmother's apartment after the alleged assault in the stairwell. However, appellant changed the "we" to "I" before signing the statement.

4. Appellant had denied that he ever wore a necklace or any other kind of jewelry, save for a ring. However, at trial the appellant admitted that he "usually" wore the cross.

5. The blue jeans appellant was wearing also had bloodstains on them but those stains were also unidentifiable.

only if the declarant's, not the appellant's, state of mind is a relevant issue. *Clark v. United States*, D.C.App., 412 A.2d 21 (1980); *Rink v. United States*, D.C.App., 388 A.2d 52, 57 (1978).[6] Such is not the case here as the government implicitly concedes. The only issue presented in this case is the identity of the murderer. This is precisely what was at issue in *Clark*. "The problem with admitting such statements is the risk that the jury will consider [them] as a true indication of a defendant's intentions or actions." *Campbell v. United States*, D.C. App., 391 A.2d 283, 287 (1978). Since the declarant's state of mind was never at issue in this trial, it was error to admit this hearsay testimony.

■■■ The more difficult question is whether this erroneous admission of hearsay was harmless. The government artfully argues that decedent's hearsay statements were corroborated by non–hearsay evidence, and therefore, their admission was harmless as they were "merely cumulative" to the direct evidence. We disagree. Preliminarily, it should be noted that the standard of review we apply here is that enunciated in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946):

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry

... is ... whether the error *itself had substantial influence*. If so, or if one is left in grave doubt, the conviction cannot stand. [*Id.* at 765, 66 S.Ct. at 1248 (emphasis added.)]

We cannot say with fair assurance that the hearsay testimony did not substantially affect the jury's verdict. Indeed, the allegedly hostile relationship between appellant and the deceased, to which the hearsay testimony was ostensibly used, was crucial to the government's case.[7] The only other evidence that is probative of the poor relationship between the two parties is Crawford's testimony that she overheard arguments between the two, and that she felt the need to call the police to the apartment occupied by the appellant and the deceased. This, standing alone, is far from persuasive.[8] Perhaps the most prejudicial aspect of this hearsay testimony to the appellant's case is the underlying inferences related to the deceased's statements of fear. The jury was free to infer that there must be some cause for such fear in the past—such cause manifesting itself as appellant's disposition to harm her in the future. Due to the highly prejudicial impact of these statements of fear, we are compelled to conclude that the erroneous admission of this hearsay testimony was error necessitating reversal.

### III. SUFFICIENCY OF THE EVIDENCE

■■■ We review the record mindful that the evidence adduced need not compel

---

6. The most notable examples of extrajudicial statements of fear falling within the state–of–mind exceptions occur when the defenses of suicide, accident, or self–defense are invoked. In these instances, "the victim's mind is of particular concern to the jury." *Clark v. United States, supra* at 25. An inquiry is made into the state of mind of the deceased declarant to determine whether he would have conducted himself in a manner consistent with the claimed defense. There is no claim of suicide, accident, or self–defense in the case before us.

7. In presenting the government's case, the prosecutor articulated in her opening and closing arguments three categories of evidence: (1) that which tended to show a poor relationship between appellant and the deceased; (2) appellant's contradicting versions of the incident;

and (3) physical evidence–photographs of appellant's body and items of clothing–that supported the government's theory of the case.

8. The government cites to *Clark v. United States, supra,* in support of its "substantial corroborative evidence" standard. *See United States v. Brown*, 160 U.S.App.D.C. 190, 209, 490 F.2d 758, 777 (1974). While it is true the Court in *Clark* held the admission of hearsay testimony harmless error because the testimony was "merely cumulative," there was direct testimony as to the incident as well as stipulation to those facts at trial. *Clark v. United States, supra* at 30 n. 9. Under theses circumstances it can be said without hesitation that there was "substantial corroborative evidence." *This is in stark contrast to the instant case.*

a finding of guilt beyond a reasonable doubt. It is sufficient if the government produces enough evidence from which a reasonable person could conclude guilt beyond a reasonable doubt. *Byrd v. United States*, D.C.App., 388 A.2d 1225, 1229 (1978); *Curley v. United States*, 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). On appeal, we must give "full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Byrd v. United States, supra* at 1229; *see Banks v. United States*, D.C.App., 287 A.2d 85, 87 (1972).[9] While it is true that the government did not negate every possible inference of innocence, this is not required in order to find a defendant guilty beyond a reasonable doubt. *Chaconas v. United States*, D.C.App., 326 A.2d 792, 798 (1974); *Banks v. United States, supra; In re T. J. W.*, D.C.App., 294 A.2d 174, 176 (1972).

Although entirely circumstantial, the competent evidence introduced in this case was nonetheless ample for the jury to draw the reasonable and permissible inference that appellant was guilty of the crime charged. The following evidence was adduced supporting the government's theory of the case. The imprint on appellant's chest and the markings on his neck, coupled with the fact that the broken shoestring necklace was found inside the apartment, would allow the jury to infer that decedent and appellant had engaged in a struggle after he returned home. It is quite possible that the imprint, which matched the shape of the cross on the necklace, was made as the decedent tried to push appellant away. The jury could also infer that appellant changed his shirt and hid his bloody outer shirt at the bottom of a pile of clothes in his closet. Appellant continued to wear his tee shirt, which was bloodstained, under his new, clean shirt. All of this could have

happened, in addition to the removal of the television and radio and disposal of the murder weapon, before appellant reported the death at approximately 9:30 a. m. Even though appellant may have been highly intoxicated, the jury could infer that at least four hours is sufficient time in which to accomplish these tasks. Furthermore, witness Mills' direct testimony that she had heard vehement arguments between decedent and appellant permitted the inference that appellant had a motive for the killing.

■ We also find significant appellant's exculpatory accounts which were frequently changed. Such explanations of conduct, when proven to be false, not only destroy a defendant's credibility but also can be used to infer consciousness of guilt. *Wilson v. United States*, 162 U.S. 613, 620–21, 16 S.Ct. 895, 898–99, 40 L.Ed. 1090 (1896); *United States v. Matousek*, 483 F.2d 286, 287 (8th Cir. 1973); *United States v. Lacey*, 459 F.2d 86, 89 (2d Cir. 1972); *United States v. Kilpatrick*, 458 F.2d 864 (7th Cir. 1972); *United States v. Pistante*, 453 F.2d 412 (9th Cir. 1971). As Wigmore cogently observed:

> [F]abrication ... is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference does not apply itself necessarily to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause. [II Wigmore, Evidence § 278(2) at 120 (3d ed. 1940).]

The falsity of the exculpatory statements, which provides the inference of consciousness of guilt, typically is proven by independent direct evidence, not by defendant's subsequent admissions. *See, e. g., United States v. Matousek, supra.* However, the inference of consciousness of guilt should be

---

**9.** The court in *Crawford v. United States*, 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967), articulated the appropriate role for an appellate court in these terms:

> It is not the function of appellate judges to weigh the evidence and decide that if *they*

had doubts other reasonable persons were compelled to have the same doubts. If that were the test the jury of twelve would be relegated to the very low grade function of secondary fact finders. [Emphasis in original.]

*no less strong* where the exculpatory statement is proven to be false by a subsequent inconsistent statement, or changed story, by the defendant himself. *Cf. United States v. Lacey, supra* (defendant's first exculpatory statements were contradicted by his own admission to police officer a half hour later, and again later by yet another inconsistent statement to secret service agent).

We are satisfied that this evidence was sufficient to permit a guilty verdict. We do not, however, find the evidence so strong as to justify a conclusion that the erroneously admitted hearsay testimony was harmless in its impact on the jury deliberations. Whether, absent this item of evidence, a jury would nonetheless convict appellant is a speculation which we are neither prepared nor willing to undertake. Accordingly, we reverse and remand for a new trial.

*Reversed and remanded.*