Bessie A. **GILES,** Appellant,

v.

**UNITED STATES,** Appellee.

No. 79–101.

District of Columbia Court of Appeals.

Argued Nov. 8, 1979.

Decided July 8, 1981.

740

William J. Mertens, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom and Katharine Kravetz, Public Defender Service, Washington, D. C., were on briefs, for appellant. A. Franklin Burgess, Jr., Public Defender Service, Washington, D. C., also entered an appearance for appellant.

Harold L. Cushenberry, Jr., Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., at the time the brief was filed, Washington, D. C., John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before KELLY, NEBEKER and HARRIS, Associate Judges.

HARRIS, Associate Judge:

■ Appellant was charged in a single-count indictment with second-degree murder while armed, D.C.Code 1973, §§ 22–2403, –3202, for the stabbing death of her

common-law husband. In a jury trial, appellant was convicted of the lesser-included offense of manslaughter while armed. She challenges the trial court's admission of an out-of-court statement made by the decedent to a co-worker that appellant had stabbed him once before. She also challenges the propriety of the trial court's cautionary instruction limiting the jury's use of the hearsay statement to appellant's state of mind.[1] We conclude that the hearsay statement should not have been admitted and that the instruction, as given, was erroneous. Nonetheless, on analysis of all the facts and circumstances of this case, we find the errors to have been harmless. Accordingly, we affirm.

## I

In the early morning hours of March 19, 1978, in the apartment which they shared, appellant stabbed her common-law husband, Howard Graves. He died at the scene. Appellant gave inconsistent versions of the events leading up to the killing and of her actions immediately thereafter. Officer Stephen Young arrived at the apartment in response to a radio run shortly after 1:00 a. m. Appellant told him that Graves had been out that evening while she was visiting friends in a neighboring apartment. When Graves returned, she said, "I didn't notice anything was wrong with him. He sat down on the couch and I gasped and then I noticed that he was cut." She then volunteered to Young that she and Graves "had been fussing and arguing all night." She told essentially the same story to Officer David Davis, adding that Graves was her uncle. She repeated this version a third time upon questioning at the scene by homicide detective Warren Donald. After interviewing the neighbors with whom appellant claimed to have spent the evening, Donald advised appellant of her rights and placed her under arrest. She then admitted that the decent was not in fact her uncle but was her common-law husband, "[t]hat they became involved in an argument and she stabbed him."[2]

Detective Donald questioned appellant again about two hours later at the homicide office, where she agreed to provide a written statement. In it, she stated that she and Graves were "kind of man and wife." On that evening, she said, Graves had been out. When he returned after midnight, he asked her for some money so that he could go back out. She ignored his request. "One thing led to another. We started arguing and then fighting and the next thing I knew, I picked up this knife and I stuck Howard with it." Appellant elaborated:

1. Appellant raises two additional issues, neither of which merits reversal. First, she contends that the trial court erred in allowing the government to present rebuttal testimony which related to the good character of the decedent when the defendant had not put the decedent's character in issue. Appellant claimed self-defense, a theory which she attempted to buttress by means of evidence that the deceased had assaulted her on a number of occasions. We perceive no error in the trial court's admission of rebuttal testimony that the decedent was, in the respective witnesses' opinion, a peaceful person and not violent, since the trial court carefully limited the use of the testimony to the issue—raised by the defense—of who was the aggressor.

   Second, appellant contends that the trial court erred in denying motions to suppress certain evidence, to wit, her statements to police and the apparent murder weapon, a freshly-washed knife seized from her kitchen sink. With respect to appellant's statements, the trial court found that appellant was not in custody when she made her oral statements to police officers who were acting in the course of an on-the-scene investigation of a homicide. The trial court found further that appellant's fourth oral statement and her written statement to police were the product of a knowing and voluntary waiver of her *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Those findings are amply supported by substantial evidence of record. *See* D.C.Code 1973, § 17–305(a). As to the knife, the trial court ruled properly that the police officers, having been called to appellant's apartment to respond to an emergency, were lawfully present at the place of seizure and that the knife was in plain view.

2. Appellant later told Detective Donald that she had lied to the police initially because she "figured I could get away with it, if I told them I was not home when he got stabbed and I did not see who did it." She decided to tell the truth when she realized that if her story were checked out, she would be "caught in a whole bunch of lies."

I don't know who hit who fist, but I know we started struggling. He slapped me a couple times and I hit him a couple times and he pushed me up against the wall and we were in the living room. I ran in the kitchen to get this big stick that I keep there, but the stick was not there. So, I just picked up the next best thing I saw, the knife, and I told him he had better never put his hands on me. He looked at me like he believed that I was playing and he started walking towards me, so, I stuck him in the chest with the knife.

Appellant then fled from her apartment, intending to "run away," but quickly returned when she remembered that her two-year-old daughter was still there and she realized that "the police would figure out that I did it." She then went to a neighbor's apartment where she called for an ambulance.

By the time of trial, appellant had refined her narration in an effort to provide support for her claim of self-defense. She testified that on the evening in question, she and Graves had gone to a party at a neighbor's apartment across the hall.[3] When they returned home, they began arguing about her failure to get his car fixed. Tempers flared. They called each other names; then Graves slapped her "and started choking [her] and banging [her] head up against the wall." In fact, claimed appellant, Graves choked her so hard that her face became numb and she could not hear.[4] She managed to free herself by kicking him in the groin, and ran to the kitchen. She testified:

> I didn't see the stick that I generally keep in the kitchen corner, so I saw the knife laying on the sink and I just picked the knife up and I told him not to come near me. I told him, "Howard, don't come near me." And, he kept coming toward me, like this, with his hands like that. I told him not to come near me, and the next thing I just hit him one time with the knife.[5]

Then, she threw the knife into the sink and turned the water on because she could not stand the sight of blood. After doing that, she ran across the hall to call for an ambulance.[6]

3. The party was in the apartment shared by Harry Exum and Charlene Fulton. They both testified that appellant and Graves had spent the evening at the party. Exum said that he was not aware of any arguments between the two. James Gray, Jr., an acquaintance of appellant and of the deceased, also attended the party. He, too, testified that the couple did not argue; he observed them "dancing and having fun, like they always did."

4. In response to a hypothetical question, medical commissioner Dr. Leroy Riddick testified that such a choking by a person with rough hands exerting a significant amount of force might leave some marks or bruises on the victim. Indeed, the evidence was that the decedent had left marks on appellant before. She testified that Graves had "very large hands" and that, when he had choked her before, sometimes she had incurred bruises. Brenda Williams, appellant's sister, said that after witnessing an altercation in which the decedent had been choking appellant, she observed injuries to appellant's throat the next day. Witnessing that same fight, appellant's brother, Ace Williams, testified that the decedent, who had big, rough hands, had left scratches and bruises on appellant. In fact, said Williams, he felt that if Graves choked appellant, it possibly would have left bruises. Significantly, the evidence was uncontradicted that appellant bore no injuries from the alleged choking she received at the hands of Graves on the night of his death, despite her assertion that he had choked her so hard that her face became numb and she lost her sense of hearing.

5. Appellant testified that she always kept a stick in the kitchen for protection to ward off intruders. She also kept a hammer in the hall for the same purpose. A series of photographs depicting the scene in appellant's apartment when the police arrived was admitted into evidence. While the photos are not part of the record on appeal, the transcript reflects that the stick which appellant claimed she was looking for was visible from the entrance to the kitchen.

6. Not surprisingly, appellant was impeached with the numerous inconsistencies—some more material than others—between her testimony and her prior written statement to the police. Illustratively, appellant was confronted with the fact that she made no mention, until trial, that the decedent had been choking her before she stabbed him, and that, at trial, she denied her earlier admission that she had fled the scene before thinking better of it and returning to call for help. Appellant testified

There was no dearth of evidence that the relationship between appellant and Graves had been a stormy one. Appellant testified that they had argued regularly and that, on occasion, their verbal arguments had escalated to the point of physical abuse. The testimony of other witnesses established that the use of force, or threats of force, was not one-sided. Appellant's brother and sister, Ace and Brenda Williams, and the decedent's nephew, William Graves, all had witnessed a particular altercation between appellant and Graves. *See* note 4, *supra.* All three testified that appellant had held an iron in her hand which, said Brenda Williams, she threatened to throw at Graves. He, in turn, threatened appellant with a bottle of bleach. Brenda Williams was present another time when appellant and Graves "was at each other." On that occasion, Graves pinned appellant to the bed, holding down her hands. The moment he let go of her, "there was a powder box sitting on the dresser and she picked the powder box up to throw it at him, but the powder flew everywhere." According to Brenda Williams, Graves retaliated by striking appellant with a belt. On cross-examination, however, she conceded that Graves was not a mean man and did not act mean in the absence of extreme provocation.

## II

In the rebuttal portion of its case, the government introduced the testimony of Eugene Thompson, who had been a co-worker of the decedent for about three years. Thompson said that he recalled a day in the fall of 1977 when Graves was not using one of his arms. When asked what Graves had told him about the arm, Thompson testified: "Well, he had said that Betty [appellant] had stabbed him in the right arm with a knife and he said he couldn't raise it up too much. He raised it up, like that, and he said he had to go to the doctor with it." [7] The trial judge gave an immediate cautionary instruction to the jury, as follows:

Now, members of our jury, we would instruct you that with regard to this evidence, that you receive it also for a limited purpose. You will receive it for [the] purpose of determining motive, intent, and state of mind. You do not receive it and you may not regard it as proof of the fact that Ms. Giles, if you accept that testimony, was guilty of the charge at hand, only as a reflection of her state of mind, her motive and intent.

In her final charge, the trial judge again instructed the jury with respect to Thompson's testimony:

You have also heard a hearsay report of a prior act of violence by Ms. Giles against Howard Graves. This evidence is admitted, solely for your consideration as to showing the state of mind of Ms. Giles and her intent with regard to the events of March 19th, 1978. You are not required to accept this evidence and whether you accept it or not, is a matter for you to decide. But, if you decide to accept that hearsay evidence, you may do so only for the limited purposes that I have explained to you and you may not consider it as tending to show in any other way, the defendant's guilt of the offense for which she is now on trial.

Appellant challenges the admission of this testimony and the trial court's instructions to consider it with respect to her state of mind. Appellant does concede that her claim of self-defense put the declarant's (Graves') state of mind in issue. Nonethe-

---

that the argument which preceded the killing was about her failure to get the decedent's car fixed; in her earlier statement, she said that the quarrel was over money. In her statement, appellant could not say how much Graves had been drinking that day; on the stand, she asserted that "he had been drinking very heavy." Additionally, appellant had admitted in her statement to telling people that Graves was her uncle; on the stand, she denied ever having

done so. In her statement, she said that she had completed the eleventh grade and that she had known the decedent for about nine years. She testified, however, that her education had stopped in the ninth grade and that she had met the decedent only two years before.

7. On cross-examination, appellant had denied ever stabbing the decedent before.

less, she insists that by virtue of the trial court's instructions, the jury received the evidence for an improper purpose and its prejudicial effect outweighed its probative value.

In ruling on the admissibility of the challenged testimony, the trial court concluded that, as evidence of "bad blood" between the parties, such a prior act of violence was admissible to allow the jury to assess all the circumstances surrounding the killing in order to determine motive, intent, and who was the aggressor.[8] That basic premise is sound, as we have noted before.

> It is fully recognized that where hostile emotions are to be proved in a case, the existence of the same emotion in the same person at another time is proper evidence. Furthermore, the conduct, attitude, and feelings of the accused and the deceased toward each other may be shown in a murder case to establish motive, malice, or intent. [Gezmu v. United States, D.C.App., 375 A.2d 520, 522 (1977) (citations omitted).]

Particularly, "[t]o show the hostility towards the deceased of a defendant charged with murder, a former assault by him upon the deceased would be relevant. * * * Its relevancy to show motive (hostility) has never been doubted." 2 Wigmore, Evidence § 306 (Chadbourn rev. 1979). See also United States v. Bobbitt, 146 U.S.App.D.C. 224, 232, 450 F.2d 685, 693 (1971); Wigmore, supra, §§ 389–90, 396–97.[9] We have noted that such evidence is especially relevant to show motive and malice in cases involving marital homicide. Rink v. United States, D.C.App., 388 A.2d 52, 56 (1978); Gezmu v. United States, supra, 375 A.2d at 522, quoting Romero v. People, 170 Colo. 234, 242–43, 460 P.2d 784, 788 (1969) (en banc).

"But while the fact of prior assaults or ill-treatment is clearly a proper matter for proof in a murder case, the manner of that proof must not violate the rules of evidence and the defendant's right to a fair trial." Wadley v. State, 553 P.2d 520, 523 (Okl.Cr. 1976). Thus, we never have approved the use of hearsay evidence to show motive or malice in a homicide case. See also State v. Parr, 93 Wash.2d 95, 102–03, 606 P.2d 263, 266–67 (1980) (en banc) (hearsay testimony of past quarrels or threats inadmissible to prove intent or conduct of the defendant). In Gezmu, supra, for example, we approved the admission of evidence of hostile relations between the defendant and the decedent (that is, evidence that the two had argued frequently). We sanctioned the use of hearsay in that case only to allow the jury to consider other aspects of the marital relationship not having to do with prior acts of violence (such as the defendant's disapproval of his wife's use of the telephone, her lack of money, and his reluctance to help maintain the apartment). 375 A.2d at 521. See Clark v. United States, D.C.App., 412 A.2d 21, 27–28 n.8 (1980). In Rink, supra, evidence that the defendant had pointed a gun at the decedent on an occasion prior to her killing of him in alleged self-defense was admitted through the testimony of a witness who had observed the incident. 388 A.2d at 55. The admission of such evidence is entirely proper. See Fox v. United States, D.C.App., 421 A.2d 9, 12 n.8 (1980); Clark v. United States, supra, at 30–31 n.9; Campbell v. United States, D.C.App., 391 A.2d 283, 288 n.3 (1978). Conversely, the trial court's conclusion that hearsay evidence of prior violence by appellant against the decedent was admissible to show appellant's motive, malice, and intent was erroneous.[10]

---

8. The trial court based its ruling, in part, on the fact that this evidence was brought in to rebut appellant's earlier denial on cross-examination that she had stabbed Graves before. With respect to the use of hearsay to prove a defendant's state of mind, we perceive any difference between introducing such evidence in the government's case in chief and introducing it in rebuttal to be immaterial.

9. At trial, the relevance of the challenged evidence was conceded by defense counsel.

10. But see Griffin v. State, 155 Ga.App. 77, 270 S.E.2d 299 (1980) (hearsay statements of murder victim properly admitted as evidence of defendant's conduct, malice, and intent); State v. Baldwin, 388 So.2d 664 (La.1980) (hearsay statement of defendant admissible to prove his motive, intent and state of mind).

## III

The admissibility of the testimony is not saved by any attempt to label it as falling within the state of mind exception to the hearsay rule. Such a characterization fails in this case for two reasons: (1) state of mind evidence, when relevant, is admissible only to show the declarant's (and not the defendant's) state of mind; and (2) while prior statements relating to a victim's fear of an accused properly are admitted to show state of mind (when relevant), mere hearsay assertions of past acts by the accused are not.

It is well settled that the state of mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant if that is at issue in the case. *Clark v. United States, supra,* 412 A.2d at 25; *Campbell v. United States, supra,* 391 A.2d at 287; *United States v. Brown,* 160 U.S.App.D.C. 190, 194, 490 F.2d 758, 762 (1973) (as amended 1974).[11] Moreover, "[i]t is clear that the deceased declarant's extrajudicial statements . . . may be admitted under this exception only if the declarant's, not the appellant's state of mind is a relevant issue." *Fox v. United States, supra,* 421 A.2d at 11–12. Thus, in this case, with appellant claiming self-defense, statements tending to show the decedent's state of mind might have been probative of "whether the victim would have conducted himself in the manner in which the defendant claims he did." *Clark v. United States, supra,* 412 A.2d at 26; *accord, Fox v. United States, supra,* 421 A.2d at 12 n.6. If the jury had been instructed properly, it might have been appropriate for its members to consider whether Graves would have followed appellant into the kitchen where she stood (knife in hand), as she claimed, in light of testimony that appellant had struck Graves with a knife once before. *See, e. g., State v. Singh,* 586 S.W.2d 410, 417–19 (Mo.1979).

Such evidence, however, could not be considered properly as reflecting "on *defendant's* state of mind rather than the victim's—*i. e.,* as a true indication of defendant's intentions, actions, or culpability." *Brown v. United States, supra,* 160 U.S. App.D.C. at 198, 490 F.2d at 766 (emphasis in original) (footnote omitted). The trial court's instructions to receive the evidence for the purpose of determining appellant's motive, intent, and state of mind therefore were erroneous.[12]

Moreover, even had the trial court properly limited the jury's use of the testimony to the deceased declarant's state of mind, the particular hearsay evidence in this case—"that Betty had stabbed him in the right arm with a knife"—was not admissible under the state of mind exception in any event. As we said in *Campbell v. United States, supra,* hearsay statements of a decedent indicating fear of the defendant are admissible under the state of mind exception; hearsay evidence of a prior specific act by the accused is not. 391 A.2d at 288. Put differently, "[d]eclarations of intention, casting light upon the future, [are] sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored." *Shepard v. United States,* 290 U.S. 96, 105–06, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1933).

There is a sound reason for such a rule. If the declarant's state of mind—fear, in the case of a claim of self-defense—is to be shown by a mere assertion of past conduct by the accused (without a concomitant expression of fear by the victim-declarant),

11. We generally have considered the deceased declarant's state of mind to be at issue in cases involving claims of suicide, accidental death, or self-defense. *Fox v. United States, supra,* 421 A.2d at 12 n.6; *Clark v. United States, supra,* 412 A.2d at 25 n.4; *Campbell v. United States, supra,* 391 A.2d at 287; *accord, United States v. Brown, supra,* 160 U.S.App.D.C. at 199, 490 F.2d at 767.

12. We note, however, that the instructions (both the immediate cautionary one and the portion of the court's final charge) were carefully worded, directing the jury that it could not accept the testimony as proof of appellant's guilt.

then the jury in effect must believe that the past act occurred in order to infer that the deceased was in fear. In other words, the hearsay must be accepted for its truth if it is to provide a basis for evaluating the declarant's state of mind. Hearsay evidence which is otherwise inadmissible cannot be bootstrapped to a recognized hearsay exception in this manner. *See Wadley v. State, supra,* 553 P.2d at 524. The government "used the declarations as proof of an act committed by some one else. * * * This fact, if fact it was, the Government was free to prove, but not by hearsay declarations." *Shepard v. United States, supra,* 290 U.S. at 104, 54 S.Ct. at 25. Any proper use of the testimony, if there was one, was "a filament too fine to be disentangled by a jury." *Id.,* at 106, 54 S.Ct. at 26.

### IV

■ We next must determine whether the trial court's errors were harmless, obliged as we are by statute to "give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." D.C.Code 1973, § 11–721(e). As enunciated by the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), this standard of review requires us to determine whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." [13] We conclude that both the admission of the challenged statement into evidence and the trial court's instructions limiting its use—but to an incorrect purpose—are harmless on the facts of this case.

In considering whether Thompson's testimony so tainted the fairness of appellant's trial as to require reversal of her conviction, it is significant that while appellant was charged with second-degree murder, she was convicted of the lesser-included offense of manslaughter. *See Wadley v. State, supra* (where appellant had been charged with murder but convicted of manslaughter, improper admission of hearsay testimony that appellant had assaulted his wife on occasions before beating her to death was harmless error). The jury thus showed that it rejected a finding of malice, the element of murder most likely to have been supplied by the challenged hearsay evidence.

Having carefully reviewed the transcript, we conclude that the errors—"not singled out and standing alone, but in relation to all else that happened" [14]—could not have had a substantial influence on the jury's verdict. There was no issue of identity in this case; appellant admitted having stabbed the decedent. Had she denied participation in the offense, the testimony would have been crucial to the government's case. "Evidence as to prior altercations of a substantive and violent nature between appellant and the decedent is probative of the question of whether the appellant is an individual capable of committing such a violent act as [Graves'] murder." *Clark v. United States, supra,* 412 A.2d at 28 (where identity is at

---

**13.** This standard of review applies to cases of nonconstitutional dimension and so is appropriate in cases of this type. *Fox v. United States, supra,* 421 A.2d at 12; *Clark v. United States, supra,* 412 A.2d at 30; *Campbell v. United States, supra,* 391 A.2d at 288.

Because we reject appellant's contention that the admission of the challenged testimony violated the confrontation clause of the Sixth Amendment, we eschew examining the error under the standard set forth for constitutional error in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As the Supreme Court has pointed out, "merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights

have been denied." *Dutton v. Evans,* 400 U.S. 74, 82, 91 S.Ct. 210, 216, 27 L.Ed.2d 213 (1970), quoting *California v. Green,* 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970) (footnote omitted). In this case, Thompson's testimony that the decedent was unable to use his arm was direct evidence based on his own observation. Absent any showing of bias or motive to falsify, we view the balance of his testimony as having been cloaked with sufficient "indicia of reliability" to withstand constitutional attack. *See Dutton v. Evans, supra,* 400 U.S. at 89, 91 S.Ct. at 220.

**14.** *Kotteakos v. United States, supra,* 328 U.S. at 764, 66 S.Ct. at 1248.

issue, admission of hearsay statements relating to victim's fear of defendant requires reversal); *accord, Fox v. United States, supra* (same, where identity is the sole issue); *United States v. Brown, supra* (same).

In this case, not only was appellant's identity not at issue, but also there was substantial evidence of hostile relations between appellant and Graves over a period of time, much of which was supplied by appellant. Even if believed by the jury, the hearsay statement assuredly was not "the only testimony introduced which indicated that appellant was psychologically capable of deliberately" using force against Graves. *Campbell v. United States, supra*, 391 A.2d at 287 (where hearsay statement that accused had held a gun at victim's head on an occasion prior to her shooting death was the only testimony suggesting that accused was capable of shooting her, reversal required). To the contrary, there was ample evidence of prior mutual use of force between appellant and Graves. Additionally, appellant testified that she kept weapons (a big stick and a hammer) in convenient locations in her apartment and that she was prepared to use them, if need be, to protect herself at any time. This situation is in marked contrast to the facts in *State v. Parr, supra*, where the improperly admitted hearsay was the only evidence in the record tending to show that the defendant was a violent person, and thus the evidence could not have been harmless. 93 Wash.2d at 106–07, 606 P.2d at 269. *Cf. Fox v. United States, supra*, 421 A.2d at 12 (where there was little evidence of a hostile relationship, improperly admitted hearsay testimony was highly prejudicial).

Furthermore, there was substantial other evidence before the jury tending to show the implausibility of appellant's defense. For example, the jury was entitled to infer consciousness of guilt from appellant's flight from the scene as well as from her washing of the knife before requesting assistance for Graves. Her credibility at trial was impeached by her prior inconsistent statements. Her first statements to police on the scene, in which she claimed that Graves had returned home already "cut," were wholly inconsistent with her eventual claim of self-defense. *Cf. Gezmu v. United States, supra*, 375 A.2d at 522 (accused's defense at trial was in direct contrast to his original explanation of his wife's death). The jury was free to consider appellant's lack of injuries after her altercation with Graves in light of testimony that when Graves had choked her before, she had suffered visible bruises and scratches. The jury properly could have weighed this evidence against appellant's statement to Detective Donald in which she did not mention that Graves had tried to choke her and in which she stated that she had incurred no injuries in the argument which led to Graves' death.

By claiming self-defense, appellant put in issue the question of who was the aggressor. Thus, while the challenged evidence was improperly admitted, it was—as appellant conceded—relevant. We accordingly view its admission as less prejudicial than if there had been no claim which put her prior relationship with Graves in issue. *See Fox v. United States, supra* (where no defense raised to support an inquiry into state of mind, admission of such hearsay may require reversal); *Clark v. United States, supra* (same); *United States v. Brown, supra* (same).

Moreover, while all of his statement should not have been admitted, Thompson's entire testimony was very brief (consuming about three pages of a 635-page transcript) and noninflammatory (lacking any narration of the past act beyond the brief statement).[15] It was unlikely, in our view, to have made a damaging impression upon the jurors in light of the cumulative effect of all that they already had heard.[16] Further-

---

15. *See United States v. Brown, supra*, 160 U.S. App.D.C. at 207, 490 F.2d at 775 (the more narration of past acts or conduct of the defendant contained in the statement, the greater the danger of jury misuse).

16. For example, with respect to appellant's self-defense claim, a trial court ruling resulted in a stipulation that Graves had been convicted of malicious wounding in Danville, Virginia, in 1957.

more, a significant portion of the statement was admissible, namely, the witness' direct observation that Graves then had been unable to use his right arm.

Finally, the pertinent instructions carefully directed the jury that it could not consider the hearsay as proof of appellant's guilt, and that it should not consider it at all without first determining whether to accept it.[17]

The evidence overwhelmingly supported the jury's determination that appellant was guilty of manslaughter while armed. We are convinced that the relatively minor evidentiary error and instructional error were harmless.

*Affirmed.*

KELLY, Associate Judge, dissenting:

The focus of an inquiry into harmless error must be on the erroneously admitted evidence and the likelihood that it substantially influenced the jury. *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946). To be sure, the balance of the evidence adduced at trial is also integral to the harmless error inquiry; however, in my judgment the evidence here did not independently refute the only issue at trial: appellant's claim of self-defense. Although there was evidence indicating that appellant had previously demon-strated aggressive conduct toward the decedent, there was also ample testimony regarding the decedent's aggressive acts toward appellant. Thus, the fact that appellant and the decedent had fought before was ambiguous evidence on the question of who was the first aggressor. On the whole, the government's case was not overwhelming, even in light of appellant's prior inconsistent statements to the police which, although incriminating, were not central to nor dispositive of her self-defense claim.

The erroneously admitted statement led the jury to believe not only that appellant was capable of attacking the decedent, but also that she previously had committed upon him the same violent act for which she was on trial. *See Clark v. United States*, D.C.App., 412 A.2d 21, 30 (1980) (erroneous admission of state of mind testimony reversible error where the testimony established that appellant had previously committed a crime of violence toward same victim). The trial judge improperly instructed the jury as soon as the testimony was given, and repeated the erroneous instruction before the jury retired to deliberate. In addition, the prosecutor, in closing argument, invited the jury, not only to view Graves' statement as reflecting on appellant's state of mind, but also to assume the truth of the statement and compare the similarities between the two stabbings. It

---

**17.** While the trial court's belief that the statement was admissible to show appellant's state of mind was incorrect, we note that a great deal of deliberation entered into its evidentiary rulings. Illustratively, the trial court excluded evidence that appellant had, years before, stabbed her then-husband, William Giles, although the government argued that that fact, too, was relevant to the issue of who was the aggressor in this case.

The prosecutor's initial reference to Thompson's testimony in his closing argument was as follows:

Ladies and gentlemen, and another point the Court will instruct you in regards to testimony that you heard from Mr. Eugene Thompson, that that evidence is to be used for a limited purpose. Mr. Thompson told you about another stabbing in which the decedent had told him that Ms. Giles had delivered to him again in the shoulder area. Where was he stabbed this time? Shoulder area. Heart. But, that's to be used for a limited purpose. And, that is, whether there was a motive, whether there was an intent, and the state of mind of both Ms. Giles and the state of mind of the decedent.

The prosecutor was correct in suggesting that the hearsay could be admissible as to the state of mind of the decedent-declarant. Also, as discussed above, only the fact that Thompson's statement was hearsay precluded its admissibility as to the motive and intent of appellant, given her claim of self-defense.

is unrealistic to think that the jury's verdict was not substantially swayed by this testi-mony.* Consequently, I would hold that its admission is reversible error.

\* The statement in this case, accompanied by an invitation of misuse, is much more prejudicial than the hearsay statements requiring reversal in *Fox v. United States*, D.C.App., 421 A.2d 9 (1980) (question of limiting instruction not discussed); *Clark v. United States, supra* at 24 (jury cautioned that testimony was only admissible to show the deceased's state of mind); and *United States v. Brown,* 160 U.S.App.D.C. 190, 194, 490 F.2d 758, 762 (1973) (as amended 1974) (jury instructed that it was not to consider the hearsay testimony to evaluate the state of mind or conduct of the defendant).